IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

**RECEIVED**

OCT 09 2025

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

| | | |
|---|---|---|
| MARCUS RUSHING, | ) | Case No.  25-cv-3894-PJS/DLM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | COMPLAINT:  Trial by Jury |
| | ) | |
| McGAW MEDICAL CENTER OF | ) | |
| | ) | |
| NORTHWESTERN UNIVERSITY; | ) | |
| | ) | |
| And | ) | |
| | ) | |
| UNITYPOINT HEALTH; | ) | |
| | ) | |
| And | ) | |
| | ) | |
| HEALTHPARTNERS; | ) | |
| | ) | |
| And | ) | |
| | ) | |
| WOOD COUNTY HOSPITAL | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR A CIVIL CASE

Plaintiff, Marcus Rushing, represented Pro Se, alleges as follows:

### I. JURISDICTION AND VENUE

1. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, including 15 U.S.C. § 1125(a) False Designation of Origin/Unfair Competition, which confer original jurisdiction on the federal courts, as well as 42 U.S.C. §1981, which prohibits discrimination in the making and enforcement of contracts, including employment relationships. This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United Staes, and pursuant to 28. U.S.C. § 1343(a)(4), as this action seeks to redress the deprivation of rights secured by federal civil rights laws. This Court also has original jurisdiction over Plaintiff's claims pursuant to 15 U.S.C. § 1673 Consumer Credit Protection Act Plaintiff, as this action arises under laws of the United States. The Plaintiff



SCANNED
OCT 1 0 2025
U.S. DISTRICT COURT ST. PAUL

seeks declaratory relief, injunctive relief, and damages for violations of rights secured by federal law.

2. This Court also has diversity jurisdiction over certain claims pursuant to 28 U.S.C. § 1332(a)(1), because the Plaintiff is a citizen of the State of Minnesota, and Defendants McGaw Medical Center of Northwestern University, UnityPoint Health, and Wood County Hospital are corporations organized and headquartered in different states – specifically:

   a. Defendant McGaw Medical Center of Northwestern University is a citizen of Illinois (incorporated and principal place of business in Illinois).
   b. Defendant UnityPoint Health is a citizen of Iowa (incorporated and principal place of business in Iowa)
   c. Defendant Wood County Hospital is a citizen of Ohio (incorporated and principal place of business in Ohio),
            and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3. This Court has supplemental jurisdiction over the state law claims asserted against Defendant HealthPartners, a corporation organized and headquartered in Minnesota, pursuant to 28 U.S.C. § 1367(a). These clams are so related to the federal questions claims asserted against all four Defendants that they form part of the same case or controversy under Article III of the United States Constitution.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because:

   a. Defendant HealthPartners resides in this judicial district, and
   b. A substantial part of the events or omissions giving rise to the claims occurred in this district, and
   c. Because at least one Defendant is subject to personal jurisdiction in this District.

## II. PARTIES TO THIS COMPLAINT

### A. The Plaintiff

1. The Plaintiff resides in Minnesota and receives mail at the following address: 2136 Ford Parkway #9304, St. Paul, MN 55116.

2. The Plaintiff is federally classified as an African American/Black.

3. The Plaintiff was employed as a Family Medicine resident physician at the McGaw Medical Center of Northwestern University from July of 2016 to Feb of 2018.

4. The Plaintiff was employed as an Occupational Medicine resident physician at HealthPartners from July of 2019 to around June of 2021.

5. The Plaintiff was employed as a Board Eligible Occupational Medicine physician at UnityPoint from around December of 2021 to Jan of 2022.

6. The Plaintiff was employed as a Board-Certified Occupational Medicine physician and Medical Director for Independence Health Employer Services, a consortium between Wood County Hospital and The Toledo Clinic, from Jan of 2023 to June of 2023.

**B. The Defendant(s)**

7. Defendant McGaw Medical Center of Northwestern University (hereinafter "McGaw") is a corporation with an address of 420 E. Superior St, STE 9-900, Chicago, IL 60611. The Northwestern McGaw Family Medicine Residency Program at Humboldt Park is a partnership between Northwestern Feinberg School of Medicine and Erie Family Health Center, Inc.

8. Defendant Wood County Hospital is a corporation with an address of 950 W Wooster St, Bowling Green, OH 43402 (hereinafter "Wood Hospital").

9. Defendant Unity Point Health (hereinafter "UnityPoint") is a corporation with an address of 1776 West Lakes Parkway, Ste 400, West Des Moines, IA 50266.

10. Defendant Health Partners Inc is a corporation with an address of 8170 33rd Ave. S., Bloomington, MN 55425.

### III.    FACTS COMMON TO ALL PLEAS

**A. Plaintiff's employment with the McGaw Medical Center of Northwestern University**

1.  The Plaintiff's race is Black.

2.  The Plaintiff is federally classified as an African American.

3.  I began employment as a Resident Physician with McGaw Medical Center of Northwestern University, hereto after 'McGaw', on July 1, 2016.

4. My performance as a Resident Physician met or exceeded McGaw's expectations.

5. During inpatient hospital rounds in or around Aug of 2017, a Black Patient informed the Plaintiff that she had concerns regarding the care that she received by a white male physician, Dr. Christopher Boisselle.

6. The Plaintiff communicated the patient's concerns to his physician supervisor and residency program director, Dr. Deborah Edberg.

7. From Aug 15-21, 2017, the Plaintiff was subjected to unequal terms and conditions of employment by Christopher Boisselle, MD, when he did not provide the Plaintiff with all the privileges of his position, when he did not train the Plaintiff in the same way as other resident physicians, and assigned the Plaintiff various duties below the Plaintiff's title.

8. On or around Aug 22, 2017, the Plaintiff reported Dr. Boisselle's discriminatory behavior to Deborah Edberg, MD, Residency Program Coordinator.

9. After reporting his concerns to Dr. Edberg, the Plaintiff was subjected to unequal terms and conditions of employment in the following ways:

   a. The Plaintiff was given a more intense work schedule.
   b. The Plaintiff was given more intense work duties.
   c. The Plaintiff was constantly threatened with demotion.
   d. The Plaintiff was assigned to rotations that were not common.
   e. The Plaintiff was scheduled for various impromptu evaluations.

10. The Plaintiff reported his concerns to various departments within and external to McGaw, including:
    a. Ombudsperson for McGaw (Oct, 2017)
    b. Designated Institutaional Official for Northwestern University (Oct, 2017)
    c. Accreditation Council for Graduate Medical Education (Oct, 2017)

Instigation of a False Patient Complaint Against the Plaintiff

11.  Prior to Plaintiff's October 2017 complaint of discrimination, there were no patient complaints against Plaintiff.

12. On October 31, 2017, Plaintiff's supervisor, Dr. Deborah Edberg, with whom he had reported his concerns for discrimination, wrote in Plaintiff's performance evaluation that: "[the supervisor] spent significant amount of time fielding patient questions and concerns regarding resident's care of…patient instead of [supervisor] attending to medical care…patient complaining that resident did not complete paperwork…patient planned on filing a formal complaint [about incomplete paperwork] to clinic".

13. The patient referenced in paragraph 5(ii) above was seen during an office visit several

months prior to October of 2017.

14. During that office visit, the patient requested that the Plaintiff complete Disability Forms so that she could receive Social Security Disability Benefits.

15. Plaintiff, while under the supervision of his supervisor, Dr. Meredith Hirshfield, informed the patient that he was unable to complete the requested forms.

16. At that point in time, the patient was upset that she could not get the disability forms completed, but reported no other concerns regarding care received by the Plaintiff.

17. Shortly, after Dr. Edberg documented correspondence with the aforementioned patient, Plaintiff received correspondence from a compliance officer of the Erie Family Health Center informing Plaintiff that four female supervisors, two of whom Plaintiff had reported his concerns for discrimination, alleged that Plaintiff battered the patient referenced in paragraph above.

18. Thereafter, a thorough investigation of the complaint occurred and the report concluded that no battery occurred against the patient at the hands of Plaintiff (the "Report"). A redacted copy of the Report is attached hereto as an Exhibit.

19. Subsequently, the patient rescinded all statements regarding any such battery.

20. Despite the findings of the investigation and the patient's retraction of her allegations against Plaintiff, McGaw recommended to the compliance officer of the Erie Family Health Center, that the Plaintiff receive "sexual misconduct" training.

21. The compliance officer objected to this recommendation, but McGaw continued to recommend that Plaintiff have sexual misconduct training over the compliance officer's objection.

22. The Report was included in Plaintiff's Promotion Grid, which was accessible to Plaintiff's peers in the program.

23. Plaintiff's supervisor would later inform Plaintiff that the Report would need to be communicated to potential employers.

24. Despite a thorough investigation, and the generation of a written report, McGaw never tendered any documentation of the same to Plaintiff prior to being constructively discharged from McGaw Medical Center of Northwestern University.

Discrepant Terms of Employment

25. Between October and Dec of 2017, the Plaintiff escalated his concerns to Joshua Goldstein, the Designated Institutional Official and Associate Dean for Graduate Medical Education for McGaw.

26. The Plaintiff's supervising faculty allowed his sleeping quarters to be confiscated during overnight rotations in Dec of 2017.

    a. Confiscation of a resident physician's sleeping quarters is an Accreditation Council for Graduate Medical Education (hereto after "ACGME") violation.
    b. The ACGME is a non-profit organization responsible for accrediting medical residency and fellowship programs in the United States.

27. The Plaintiff's supervising faculty refuse to work with him on required rotations.

28. The Plaintiff's supervisors and professional peers begin to publicly accuse the Plaintiff of performance issues.

29. The Plaintiff was excluded from receiving incentive bonuses that similarly situated non-black residents were allowed to receive.

30. The Plaintiff was subjected to hyperscrutiny, such that his resident trainee profile grew from less than 20 pages contained in 1 folder spanning over a year of performance evaluations to approximately 80 pages filling over 10 folders that spanned only a few months of evaluations.

31. On or around Dec 21, 2017, Joshua Goldstein, Designated Institutional Official and Associate Dean for Graduate Medical Education for the McGaw Medical Center of Northwestern University, stated to the Plaintiff that "he didn't believe me [the Plaintiff]", and that "he knew [Dr.] Edberg personally", "that he would not recommend that I [the Plaintiff] pursue an investigation", "and that I [the Plaintiff] should consider Leave in order to rebuild trust in my program".

32. The Plaintiff took a Leave of absence on 12/22/2017 and pursued immediate transfer options to alternate employment outside of McGaw.

33. Upon returning from leave, in February of 2018, the Plaintiff discovered that there were several explicit references to his race and a race-based threat in his Performance evaluation. Some examples are provided below.
    a. "I know that a big part of your [Plaintiff's] character is seeking truth, and it may feel disingenuous to endorse anything that you disagree with. But it will bite you in the ass if you don't learn to concede sometimes to the group, even if they are wrong. You can be completely right, and it won't matter if people have already turned against you. It is a dangerous world for a Black man, and you can't afford to make it more dangerous for yourself by being unable to let things go".

    b. "One of the [female] nurses developed a grudge against him [Plaintiff], and turned the social setting into a clique, ostracizing him. There was an element of groupthink and scapegoating. I think race played a role because of some comments she made. I was impressed by how he handled it. He never blamed her or attacked her. He was always

professional, and even gracious"

    c.  "[Plaintiff] loses the ability to be tactful or have social skills...I think this is a defense mechanism you see sometimes with marginalized groups...and unfortunately it can be a losing social strategy"

34. Additionally, the Plaintiff discovered several evaluations with narratives regarding the Plaintiff's receptivity to feedback, fund of knowledge, and professionalism that were in direct contrast to both subjective and objective evaluations received prior to opposing discrimination and retaliation.

    a.  For example, performance evaluations regarding receptivity to feedback that occurred prior to 10/24/2017 included the following statements:

        i.  "Takes feedback well when I disagree with the plan. He takes ownership of his patients. Really seems to enjoy his work in clinic and has a positive attitude"

        ii.  "Solicits feedback and accepts it professionally. Eager to learn"..."very professional to staff"..."extremely professional"

        iii.  "solicits feedback, does a lot of reading"

        iv.  "takes feedback well and uses it"

    b.  Performance evaluations regarding receptivity to feedback that occurred after 10/24/2017 included the following statements:

        i.  "difficult to give him feedback", "seemed resistant to adopting a collaborative team style"

        ii.  "When giving him feedback on being resistant to feedback I cited this as an example which angered him"

        iii.  "very defensive when given feedback directly"

        iv.  "recommended he find additional mentors outside of his residency to help him navigate feedback"

        v.  "I would like to see [Plaintiff] be able to accept constructive feedback without becoming defensive or angry"

    c.  Performance evaluations regarding fund of knowledge prior to 10/24/17 included the following statements:

        i.  "At expected. Appropriate"

        ii.  "At to slightly above expected"

        iii.  "He has a wonderful grasp of the basic sciences and application to clinical care in the sense of ddx. This is above expected"

        iv.  Under "What are the resident's greatest strengths?" is the following response:

            1.  "knowledge, knows the evidence. Strong knowledge base"

        v.  "At expected – does his own research and applies to the patient. Above expected in my opinion. Has great Ddx"..."I would say above [expected] for some areas"

    d.  Performance evaluations regarding fund of knowledge after 10/24/17 included the following statements:

        i.  "Below expected level

        ii.  "need for remediation"

        iii.  "[Plaintiff] has many areas of concern for the residency. Though he does lack

      a fund of knowledge to adequately care for patients"

    iv. "[Plaintiff] may benefit from extension of PGY-1 training (for fund of knowledge)…and PGY-2 training"

Interference with Transfer; Interference with Alternate Employment while at McGaw

35. By the summer of 2017, the Plaintiff had received two post-graduate offers of employment to commence after his residency at McGaw ended; one at the University of Wisconsin-Madison and the other at Carle Hospital.

36. Between September and October of 2017, and upon information and belief, the Supervisor, Dr. Edberg, whom the Plaintiff reported his concerns for discrimination to, began to correspond with the University of Wisconsin-Madison's Family Medicine Department. Thereafter, the University of Wisconsin-Madison rescinded its post-graduate employment offer.

37. The Plaintiff was provided a verbal offer from to continue training as a PGY-2 resident physician at the Lake Forest Family Medicine residency program in Lake Forest, Illinois.

38. This verbal offer was then then rescinded without explanation.

39. The Plaintiff applied to transfer to several other Family Medicine Residency programs within the State of Illinois and outside of the State of Illinois.

40.  The Plaintiff had a phone interview with staff at the McLeod Family Medicine Residency in McLeod, South Carolina.

41. The Plaintiff received a verbal offer for a direct transfer to McLeod Family Medicine Residency program to continue his PGY-2 training without an employment gap or interruption.

42. On or around November of 2017, Graduate Medical Education (GME) staff from the McGaw Medical Center of Northwestern University inquired of the Plaintiff if he had received any transfer offers, so that they could facilitate transfer.

43. The Plaintiff communicated to GME Staff a verbal offer received from McLeod Family Medicine Residency program.

44. GME Staff then informed the Plaintiff that they would reach out to the McLeod Family Medicine Residency program.

45. After this meeting with the Graduate Medical Education staff, the Plaintiff then attempted to reach out to the Residency Program Director at the McLeod Family Medicine Residency program, but none of the Plaintiff's phone calls or voice messages were returned.

46. The Plaintiff was later informed by a resident physician at McLeod Family Medicine

Residency program that the offer of employment was rescinded and that no explanation was provided by the Residency Program Director.

Constructive Discharge from McGaw

47. Because of the aforementioned, and the threat placed in his performance evaluation, in paragraph 33(a) above, the Plaintiff felt that it was no longer safe to return to McGaw.

48. On the same day that the Plaintiff discovered the race-based threat in his performance evaluation, he filed an EEOC complaint with the Illinois Department of Human Rights.

49. The Plaintiff felt that it was no longer save to return to McGAW as a PGY-2 employee.

## B.  Plaintiff's Departure from the McGaw Medical Center of Northwestern University
Interference with Transfer; Interference with Alternate Employment, and Professional Licensure after departing McGaw

50. The Plaintiff was unable to secure a transfer to another family residency program, such that he could continue from his PGY-2 position without a gap in employment.

51. Because of the aforementioned, the Plaintiff had to relinquish a signed post-graduate contract offer with Carle Hospital.

52. The Plaintiff signed an employment contract with Adventist Hinsdale, now Amita Health, to restart his family residency training as a PGY-2 beginning on July 2, 2018.

53. Between January and March of 2018, the Plaintiff files (4) complaints (on or around Jan 19, 2018, Feb 23, 2018, March 3, 2018, and March 10, 2018) to the ACGME regarding discrimination and retaliation.

54. Between January and April of 2018, the Plaintiff reported his concerns regarding discrimination and retaliation to the Illinois Department of Professional and Financial Regulation (hereto after "IDFPR"), the medical licensing board for Illinois.

55.  Between February and May of 2018, McGaw canceled the Plaintiff's trainee professional medical license.
    a.  McGaw was aware or should have been aware that the Plaintiff had a contract with Adventist to continue residency training.
    b.  McGaw was aware or should have been aware that the Plaintiff needed professional medical licensure to continue his residency training.
    c.  McGaw elected not to transfer the Plaintiff's trainee medical license from McGaw to Adventist

56. On or around May 4, 2018, and sometime after the Plaintiff reported his concerns to the IDFPR, the Plaintiff receives correspondence from the IDFPR stating that the Medical

Disciplinary Board of the Department of Financial and Professional Regulation received a report regarding the Plaintiff on around May 3, 2018.

    a. The IDFPR, in the aforementioned correspondence, included a Professional Conduct report from Caroline Haldin, the Licensing Coordinator for Graduate Medical Education at McGaw, dated by McGaw 4/3/2018, and stamped "Received" by IDFPR's medical unit on 4/5/2018.

57. The Plaintiff timely provided correspondence with exhibits to IDFPR.

58. The Plaintiff commenced training at Adventist on or around 7/2/2018.

59. However, between July and August of 2018, the Plaintiff's Residency Program coordinator at Adventist Hinsdale began to insist that the Plaintiff needed a permanent Illinois medical license by July 30, 2018 to avoid termination.

    a. The Plaintiff's contract with Adventist indicated that the Plaintiff could maintain a "valid Illinois medical temporary or permanent license".
    b. The Plaintiff had no authority to maintain a temporary medical license, as temporary medical licenses belonged to the institutions that granted them (ie, McGaw or Adventist).
    c. Adventist did not grant the Plaintiff a temporary medical license.
    d. No other family medicine resident at Adventist was required to apply for a permanent license.
    e. Almost every PGY-1 through PGY-3 family resident had institutional temporary medical licenses.

60. The Plaintiff was eligible for a permanent Illinois medical license.

61. The Plaintiff timely applied for a permanent Illinois medical license on or around 3/27/2018.

62. However, on or around 7/9/2018, the IDFPR rejected the Plaintiff's application for permanent licensure without explanation.

63. On or around 8/7/2018, the Plaintiff received an Intent to Terminate from Adventist, indicating that the Plaintiff's last day would be Aug 27, 2018.

64. Sometime thereafter and prior to Aug 27, 2018, the Plaintiff met with Zewdu Haile, MD, the Residency Program Director for Adventist.

    a. Dr. Haile explained to the Plaintiff that he would need an advocate with political power as what was occurring to me was above his head and beyond his control.

65. At that time the Plaintiff consulted Attorney Jackie Stein regarding permanent medical licensure and she explained that IDFPR had assigned the Plaintiff's licensure request to a Mr. Lozovskiy.

66. The Plaintiff was terminated from Adventist on Aug 27, 2018.

67. The Plaintiff's only source of income since departing McGaw was unemployment income awarded in or around 3/28/2018 and residency income from July to Aug of 2018.
    a. The Plaintiff's household size was 6 at that time, which included his wife, his 3 marital children, aged 2, 6, and 10 at that time, and his Mother, who had a diagnosis of cancer at that time, and who had been living with the Plaintiff to help care for the marital children.
    b. Adventist had challenged the Plaintiff's request for unemployment income.

68. By reason of the aforementioned in paragraphs 1-67 above, the Plaintiff determined that it was no longer possible to continue training in his field of Family Medicine and that it was no longer feasible to continue medical training in Illinois.

69. The Plaintiff decided to re-enter the residency match and pursue a medical career in a completely different medical subspecialty in another state.

70. In or around October of 2018, the Plaintiff applied for a PGY-2 position at HealthPartners to pursue Occupational Medicine/Preventive Medicine in Minnesota.

### D. Plaintiff enters into a settlement agreement with McGaw while under duress

71. The Plaintiff re-states and incorporates, as if fully rewritten, every statement contained in the proceeding paragraphs.

72. By October of 2018, the Plaintiff had a household of 6 that included 3 minor children with no employment.

73. Phone conversations with Diane Wayne, the President of McGaw, suggested to the Plaintiff that McGaw would be using the false patient complaint against the Plaintiff.

    a. Of note, no formal insurance claims had been brought against the Plaintiff at any point during his residency training.

74. At that point in time, the Plaintiff had received correspondence from Erie Family Health's Compliance officer that the complaint had been resolved, McGaw had not provided the Plaintiff with formal documentation that the complaint had been resolved.

75. Under the aforementioned conditions in paragraphs 71 – 74 above, McGaw offers the Plaintiff a settlement agreement.

76. Phone conversations with Diane Wayne, the President of McGaw, suggested to the Plaintiff that McGaw would be using the false patient complaint against the Plaintiff if he did not sign the settlement agreement and that he would have no chance of continuing his career in medicine if he did not sign the settlement agreement.

77. The Plaintiff had retained through contingency agreement three attorneys (Paul Strauss, Al

Hofeld, and Robert Cohen) to litigate against McGaw in court.

78. However, after phone conversations with McGaw each of the aforementioned attorneys refused to file a claim in federal or state court.

79. Having no knowledge of how to initiate a claim pro se and having no attorney that would be willing to litigate against McGaw in court, and being the primary breadwinner of a household of 6, and having no medical employment, and having approximately $500,000 in medical education debt, and upon information and belief of the Plaintiff at that point in time, the Plaintiff saw no viable option but to enter a settlement agreement with McGaw.

80. The Plaintiff then asked asked Attorney Henderson Banks to review the settlement agreement.

81. Between October and November of 2018, Attorney Banks begins to correspond with the attorney from McGaw, Scott Warner, of Husch Blackwell.

82. On or around 11/16/18, both the Plaintiff and McGaw enter into a settlement agreement.

## IV. CAUSES OF ACTIONS
### A. (Plaintiff v. Defendant McGaw)

**Count I** – Tort of Fraudulent Inducement, Coercion & Duress, Illinois Common Law
**Count II** – Tort of Fraudulent Misrepresentation; Illinois Common Law
**Count III** – Tort of Fraudulent Concealment, Illinois Common Law
**Count IV** – Tort of Material Misrepresentation, Illinois Common Law
**Count V** – Unjust Enrichment, Illinois Common Law
**Count VI** – Breach of Contract and Settlement Agreement; Coercion & Duress; Partial Performance of a Settlement Agreement, Illinois Common Law
**Count VII** – Tortious Interference with Business Relationship, Illinois Common Law
**Count VIII** – Tortious Interference with Attorney-Client Relationships
**Count IX** – Violation of the Illinois Human Rights Act (775 ILCS 5), Section 2-102(A), Section 6-101(A), Section 2-102(B)(1), and section 8-111.
**Count X** - Violation of the Illinois Whistleblower Act (740 ILCS 174), Sections 15, 20, 20.1, and 25
**Count XI** – Violation of Illinois Right of Publicity Act, 765 1075
**Count XII** - Tort of Abuse of Process, Coercion & Duress; Illinois Common Law
**Count XIII** – Tort of Intentional Infliction of Emotional Distress, Illinois Common Law
**Count XIV** – Violation of 15 U.S.C. § 1125(a) False Designation of Origin/Unfair Competition.
**Count XV** – Violation of 42 U.S.C. §1981(a) for Race-Based Discrimination and Retaliation for opposing race-based discrimination.
**Count XVI** – Tortious Interference with Prospective Employment and Business Relations, Illinois Common Law

## B.  (Plaintiff v. Defendant Wood Health)

**Count I** – Trespass to Chattel, Ohio tort Law

**Count II** - Tortious Interference with Attorney-Client Relationships

**Count III** – Tort of Intentional Infliction of Emotional Distress, Common Law Ohio

**Count IV** – Violation of 15 U.S.C. § 1125(a) False Designation of Origin/Unfair Competition.

**Count V** – Violation of 42 U.S.C. §1981(a) for Race-Based Discrimination and Retaliation for opposing race-based discrimination.

**Count VI** – Tortious Interference with Prospective Employment and Business Relations, Ohio Common Law.

**Count VII** – Tort of Intrusion Upon Seclusion, Ohio Common Law

**Count VIII** – Violation of Ohio Revised Code §§ 4112.02(A); 4112.14(A) – Unlawful discriminatory practices including discrimination, wrongful termination, and Harassment.

**Count IX** – Retaliation including blacklisting in Violation of Ohio Revised Code § 4112.02(l) et seq (Ohio Fair Employment Practices Law – OFEPL)

**Count X** – Wrongful Termination in Violation of Ohio Public Policy (Public Policy Derived from Ohio Rev. Code § 4112, the Ohio Fair Employment Practices Law)

**Count XI** – Tort of Abuse of Process, Coercion & Duress, Ohio Common Law

**Count XII** – Breach of Contract, Ohio Common Law, Ohio Common Law

**Count XIII** – Breach of Implied Covenant of Good Faith and Fair Dealing, Ohio Common Law

**Count XIV** – Retaliatory Discharge in Violation of Contractual Rights, Ohio Common Law

## C.  (Plaintiff v. Defendant UnityPoint)

**Count I** – Tort of Misappropriation of Name/Likeness, Iowa Common Law

**Count II** - Tort of False Light, Iowa Common Law

**Count III** – Tort of Defamation Per Se, Iowa Common Law

Light, Invasion of Privacy, Iowa Common Law

**Count IV** – Tort of Intentional Infliction of Emotional Distress, Common Law Iowa

**Count V** – Violation of 15 U.S.C. § 1125(a) False Designation of Origin/Unfair Competition.

**Count VI** – Violation of 42 U.S.C. §1981(a) for Race-Based Discrimination and Retaliation for opposing race-based discrimination.

**Count VII** – Violation of 15 U.S.C. § 1673 Consumer Credit Protection Act (related to wage garnishment limits)

**Count VIII** – Violation of Iowa Wage Payment Collection Law, Iowa Code Chapter 91A

**Count IX** – Violation of 42 U.S.C. §1981 for Race-Based Discrimination in Contracting

**Count X** – Tort of Defamation per se

**Count XI** – Violation of Breach of Contract, Iowa Common Law

## D.  (Plaintiff v. Defendant HealthPartners)

**Count I** – Misappropriation under Minnesota Law (Lake v. Wal-Mart, 582 N.W.2d231 (Minn.1988))

**Count II** – Violation of Minn. Stat §179.60 (Blacklisting)
Tortious Interference with Prospective Employment, Minnesota Common Law
**Count III** – Tort of Intentional Infliction of Emotional Distress, Minnesota Common Law
**Count IV** – Violation of 15 U.S.C. § 1125(a) False Designation of Origin/Unfair Competition.
**Count V** – Violation of 42 U.S.C. §1981(a) for Race-Based Discrimination and Retaliation for opposing race-based discrimination.
**Count VI** – Tortious Interference with Prospective Employment and Business Relations, Minnesota Common Law

### E.  Timeliness and Equitable tolling

Plaintiff respectfully submits this statement in support of this refiled complaint and to involke the doctrines of equitable tolling and continuing violations as recognized in the Eight Circuit.

**I. Background and Procedural History**
   1. Plaintiff timely initiated the original action on May 5, 2025, within the applicable statutory limitation period, asserting claims arising from ongoing acts of retaliation, discrimination, and harassment by Defendants.
   2. The complaint was **received by the Court** and docket, however, only **three (3) days later,** Plaintiff received a **Notice of Dismissal Without Prejudice**, before any motions, summonses, or waivers of service had been acted upon by the court.
   3. Plaintiff subsequently refiled this action promptly upon receiving notice of the premature dismissal, acting diligently and in good faith to preserve all claims.
   4. Prior to dismissal, Plaintiff had **filed a request for an extension of time** and **responded to an Order to Show Cause**, but no rulings were issued on those filings before dismissal occurred.

**II. Continuing Course of Misconduct**
Defendants have engaged in a continuing course of misconduct that extends into the period relevant to the filing of this refiled action
This ongoing conduct includes, but is not limited to:
   1. Retaliation and interference with Plaintiff's employment and professional opportunities;
   2. Harassment and discrimination connected to prior protected activity; and
   3. Conduct designed to frustrate Plaintiff's pursuit of redress through litigation.
Because the acts are part of an ongoing pattern that continued into the relevant filing period, the **continuing violation doctrine** preserves the timeliness of Plaintiff's claims.
See *Rowe v. Hussmann Corp.*, 381 F.3d775, 781 (8th Cir. 2004); *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007).

**III. Failure of Defendants to Waiver Service**
Plaintiff properly requested **Waiver of Service of Summons** under **Rule 4(d)** of the Federal Rules of Civil Procedure. Defendants **failed and refused to return those waivers**, despite clear notice and opportunity to do so. As a pro se litigant with limited financial resources, Plaintiff reasonably relied on the waiver mechanism provided by Rule 4(d) to avoid unnecessary service costs. Defendants' refusal to waive service caused additional delay beyond Plaintiff's control and constitutes an extraordinary circumstance warranting equitable tolling. See *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990); *United States v. Martin*, 408 F. 3d 1089, 1093-94 (8th

Cir. 2005).

## IV. Health-Related and Extenuating Circumstances

Further, during the relevant period, an additional extenuating health-related circumstance (both pre-labor and post-partum concerns related to the birth of their child during this time period) materially affected Plaintiff's capacity to act, particularly as a pro se litigant with limited legal and financial resources. Under 8th Circuit Court precedent, equitable tolling is appropriate when health conditions or personal hardships materially impair a litigant's ability comply with deadlines. See *Holland v. Florida*, 560 US 631, 649 (2010); *Baker v. Norris*, 321 F. 3d 769, 771 (8th Cir. 2003).

## V. Legal Standard for Equitable Tolling

Equitable tolling applies where a litigant (1) diligently pursued his rights and (2) was prevented from timely filing due to extraordinary circumstances beyond his control. See *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *United States v. Martin*, 408 F.3d 1089, 1093 (8th Cir. 2005). The doctrine ensures fairness when rigid enforcement of deadlines would result in inequity or injustice. See Irwin, 498 U.S. at 96 ("Equitable tolling may be allowed where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where he has been induced or tricked by his adversary's misconduct.").

## VI. Application to the Present Case

1. Plaintiff filed the original complaint within the statutory period, demonstrating diligence.
2. Defendants' refusal to waive service under Rule 4(d) directly impeded timely progress.
3. The Court's premature dismissal within 3 days of docketing was an administrative event outside Plaintiff's control.
4. Plaintiff refiled promptly after receiving notice of dismissal, evidencing continuous pursuit of his rights.
5. Plaintiff's health circumstances and limited means as a pro se litigant constitute extraordinary conditions that justify equitable tolling.

Accordingly, the combination of (a) Defendants' obstructive conduct, (b) the court's premature dismissal, and (c) health-related and financial hardship satisfies the equitable tolling standard under Eighth Circuit law.

## VII. Conclusion

For these reasons, Plaintiff respectfully requests that this Honorable Court:
1. Recognize that the instant complaint is timely under the doctrines of continuing violation and equitable tolling;
2. Deem any limitations period tolled during the pendency of the prior action and during the period affected by Defendants' refusal to waive service and Plaintiff's incapacity; and
3. Permit this action to proceed on its merits in the interests of justice and fairness.

### F. McGaw interferes with a tribunal where the Plaintiff is a Respondent and breaches a Settlement Agreement with Plaintiff

83. The Plaintiff re-states and incorporates, as if fully rewritten, every statement contained in the

proceeding paragraphs.

84. The Plaintiff and his wife began to have marital problems after he was constructively discharged from McGaw.

85. In or around January of 2019, the Plaintiff's wife requested a separation.

86. In or around July of 2019, the Plaintiff departed to begin his residency at HealthPartners in St. Paul, Minnesota.

87. In or around Oct of 2019, the Plaintiff's spouse retained counsel, Matthew Farmer, an alumnus of Northwestern University, and filed a petition for dissolution of marriage (Case No. 2019D8356, Circuit Court of Cook County, Illinois)

88. The Plaintiff first learned of this proceeding when his Residency Program Coordinator, Paula Geiger, informed the Plaintiff that Matthew Farmer had faxed a Petition for Dissolution of Marriage to the Plaintiff's Residency Program Director, Ralph Bovard.

89. The divorce proceeding lasted from around Oct 4, 2019 until May 30, 2023, with the post-trial stage continuing until the present.

    a. During this time period, the Plaintiff was employed as an Occupational Medicine resident physician at HealthPartners from around July of 2019 until around June of 2021.
    b. The Plaintiff was employed as a Board Eligible Occupational Medicine Physician at UnityPoint Health from around January of 2022 until around January of 2023.
    c. The Plaintiff was employed as a Board-Certified Occupational Medicine Physician at Wood County Hospital from around January of 2023 until June of 2023.
    d. The Plaintiff had intermittent work as a self-employed independent contractor in 2024, parts of 2025, and the latter part of 2023.

90. Attorney Henderson Banks had represented the Plaintiff in the tribunal from around 2/18/2021 until around Oct of 2021.

91. A trial was scheduled for Nov 15-18, 2021, where the Honorable Judge Haracz would be presiding.

92. However, Attorney Banks reported a conflict of interest that prevented him from proceeding with litigation.

93. From around Oct of 2019 until around October of 2021, the Plaintiff reported concerns regarding biased adjudication against the Plaintiff, who was the Respondent in that tribunal.

94. On Oct 15, of 2021 and on Oct 19, 2021, the Plaintiff met with attorneys from two independent law firms.

a. Both law firms had communicated to the Plaintiff in confidence that the biased adjudication was because the Plaintiff was a "whistleblower".

b. Specifically, one of the law firms stated that "this side of the court does not like whistleblowers".

c. The attorney explained that "that side of the court", referring to Federal Court is not like "this side of the court", referring to State Court.

95. The Plaintiff retained new counsel for representation for the trial scheduled for Nov 15-18th, but on the eve of trial the trial dates were stricken and the presiding judge withdrew.

96. A new judge, Judge Michael Forti, an alumnus of Northwestern University was appointed to preside over the case sometime between Nov of 2021 and January of 2022.

97. Between January and March of 2022, the aforementioned tribunal was then consolidated with a foreclosure case between the Plaintiff in the case herein and Huntington Bank (Case CH2022CH01100, Circuit Court of Cook County, Illinois).

98. Around this same time, Judge Forti, an alumnus of Northwestern University, appointed a Lisa Copeland, an alumnus of Northwestern University, as Guardian Ad Litem for the marital children.

99. On or around March 31, 2022, the Petitioner, the Plaintiff's spouse at that time, issued a subpoena to McGaw and three other institutions.

100. All of the institutions, except for McGaw, responded to the subpoena request by April 21, 2022.

101. On or around April 7, 2022, McGaw by and through their counsel, Scott Warner of Husch Blackwell, reached out to Henderson Banks via e-mail, requesting that the Plaintiff file a Motion to Quash the Subpoena to McGaw.

a. Though not representing any party, on or around Sept 12, 2022, Attorney Banks would later begin corresponding with the opposing counsel in the foreclosure case.

b. Shortly thereafter, on Sept 15, 2022, and again on Jan 2, 2023, the Plaintiff reported Attorney Banks to the Illinois Attorney Registration and Disciplinary Commission (hereto after "IARDC") for concerns of interfering with the tribunal and for generating and submitting as exhibits to the IARDC fraudulent invoices for services that were never rendered.

c. Thereafter, Judge Forti would then schedule a remote conference with Henderson Banks scheduled for Oct 27, 2022, when the Plaintiff was not served notice or invited to attend that conference.

102. The Plaintiff did not feel comfortable regarding this request because of 1 or more of the following reasons:

a. Per the Plaintiff's understanding of the settlement agreement between McGaw and

the Plaintiff, both parties were to respond to court orders and subpoenas.
  i. The settlement agreement stated in part that disclosures were permitted if "…required by…law" and by a "…lawful subpoena or court order".

b. The Plaintiff did not believe that he had the authority to Quash a subpoena that he did not in fact issue upon McGaw.

c. McGaw reached out to Henderson Banks, when Henderson Banks was not in fact representing the Plaintiff at that point in time.
  i. The Teague Law firm was representing the Plaintiff at that point in time and upon information and belief of the Plaintiff, McGaw had not reached out to the Teague Law firm.

103. On April 20th of 2022, the Plaintiff initially agreed to file a Motion to Quash the subpoena.

104. This request was entered as an Order on June 7th , 2022 with a continuance set for June 13th 2022.

105. On June 13th, 2022, the Motion to quash was continued until Aug 22nd , but then falls of of the Aug 22nd Order completely and a status hearing is set for Sept 8, 2022. An Order from Sept 2nd, 2022 indicates a continuance in the form of a Summary Hearing scheduled for Oct 5th, 2022 and again on Nov 9th 2022.

106. Preceding the hearing from Nov 9th, 2022, the Plaintiff communicated to his counsel, then Attorney Russel Knight, that he wished to withdraw his motion to quash the subpoena to McGaw.

107. When the Plaintiff's counsel mentioned to Judge Forti, that he wished to withdraw his Motion to Quash the subpoena for McGaw, the following occurred:

  a. The opposing counsel, Attorney Roya Samarghandi, without ever serving any prior notice, verbally petitions Judge Forti to re-adjudicate a Verified Five (5) Count Petition for Child Support, Temporary Maintenance, Contribution Towards Household Expenses, Exclusive Possession of Marital Residence and Possession of 2013 Kia Rio" that was previously adjudicated by Judge Haracz on Oct 25, 2019.

  b. Judge Forti then requests that Attorney Samarghandi and Attorney Knight appear in a private Zoom breakout session with Judge Forti.

  c. After approximately 20-30 minutes of had passed, Judge Forti and the two attorneys return from the private Zoom breakout session. Judge Forti then states that he would communicate findings at a later date and the hearing is ended.

108. Sometime thereafter on or around Nov 13th, the Plaintiff asked his counsel to withdraw from the case.

109. On Dec 1, 2022, Judge Forti's Clerk communicated an Order from the Nov 9th hearing to Attorney Samarghandi, rather than to all parties at the same time.

110. Attorney Samarghandi then sends the Order to Attorney Scott Warner, McGaw's attorney

but not to the Plaintiff.

111. On or around 12/2/22, Attorney Knight, then emails correspondence from Attorney Samarghandi where she is asking whether or not she had the authority to proceed with an Agreed Uniform Order of Support, considering that neither the Plaintiff nor the Plaintiff's former counsel had agreed with the Order.
    a. Of note, the Plaintiff had already been paying timely child support at that point in time.
    b. The Plaintiff has paid future child support pursuant to the previously adjudicated order that had been re-adjudicated.
    c. The Nov 9th hearing was intended to be a Summary Hearing regarding the Motion to Quash the subpoena to McGaw, and no prior Order had indicated that a Uniform Order of support would be heard on Nov 9th.

112. On the same day, the Plaintiff filed a Motion in Opposition of the entry of the Uniform Order of Support, but his motion was rejected without an explanation.

113. Per Judge Forti's clerk, the next court dates were as follows: Dec 12th at 10am, Dec 14th at 10am, Dec 28th at 10am, Dec 29th at 10am, January 3rd at 2:30, April 17th at 10am and April 18th at 10am.

114. On 12/9/22, McGaw's attorney Scott Warner reaches out to the Plaintiff and asks if the Plaintiff intends to modify the Support Order or modify the Motion to Quash.

    a. The aforementioned made the Plaintiff feel uncomfortable because it appeared that McGaw's attorney was attempting to pressure the Plaintiff into agreeing to Quash a subpoena to McGaw otherwise the Uniform Order that was conceived after the Plaintiff declined to Quash the subpoena on 12/14/22 would remain.

115. Per communication with Attorney Knight, Attorney Samarghandi, and with Judge Forti's Clerk, the next court date was for a hearing to withdraw the Plaintiff's counsel with Judge Powers on Dec 14th, 2022 at 10am.

116. However, on Dec 14th, Claimant receives an e-mail correspondence from Attorney Samarghandi stating that there was an additional Court Date with Judge Forti (no time or Zoom information provided) that took place on Dec 14th and addressed the following: Re-entry of a Proposed Order of Support as well as entry of Withdrawal of Claimant's previous counsel

117. Of note, the Dec 14th and Nov 9th Orders are very similar, but the Dec 14th Order notably omits the following paragraph:

    (a) **"The Respondent's Motion to Quash Subpoena to McGaw Medical Center of Northwestern University is withdrawn. McGaw medical Center shall comply with the previously issued subpoena within twenty-one (21) days"**
    (b) Additionally, the Nov 9th Order granted McGaw 21 days to comply with the

subpoena request, but when it was sent to parties on Dec 1, 2022, McGaw had already not been compliant with the Order as the 21 days had already passed.

118. The Plaintiff then reached out to Judge Forti's Clerk as well as to Attorney Samarghandi to get clarification on whether or not a Court Date occurred on Dec 14th. The Plaintiff received no confirmation from Judge Forti's Clerk that Judge Forti had a hearing on 12/14/22. The Plaintiff had not received any notice of a hearing in front of Judge Forti on 12/14/22.

119. On Dec 14, 2022, McGaw's attorney Scott Warner writes an email to the Plaintiff stating the following:

> "In light of the order [unsigned Uniform Order of Support Order from Dec 14, 2025 that was e-mailed to him by Attorney Samarghandi] that has been entered…I'd like to propose that you agree to the production of the limited documentation reflected in the second attachment, which Roya Samarghandi has indicated would be acceptable…as things currently stand, the court's order stands, so unless you are able to have it modified in the near future, McGaw is obligated to comply with it"

120. The aforementioned email was concerning for the Plaintiff because it suggested that McGaw had already reached out to the opposing counsel in a divorce proceeding involving the Plaintiff in order to agree to an order.

121. The Plaintiff then reported Attorney Samarghandi to the IARDC on 12/23/2022 for concerns of fraud and her involvement with Scott Warner as it related to the consolidated tribunal.

   a. Additionally, Samarghandi's uniform order of support resulted in the garnishment of greater than 50% of Plaintiff's disability income, rendering that plaintiff who had at that time a spouse and two minor children living with him, without income.

122. McGaw's communication with the opposing counsel in a divorce proceeding combined with the retaliatory conduct by McGaw in paragraphs 1-82 above made the Plaintiff feel threatened and uncomfortable.

123. Additionally, the Plaintiff believed that the redacted items suggested by McGaw's attorney would bias the tribunal against the Plaintiff.

124. Finally, the Plaintiff had concerns that McGaw had a version of the settlement agreement that was different than the Plaintiff's settlement agreement, because the items that Scott Warner was intending to disclose to the court were not a part of any settlement agreement that the Plaintiff had received.

125. The Plaintiff declined to agree to a limited production of the subpoena and instead requested that McGaw disclose the complete agreement.

126. McGaw's attorney Scott Warner then e-mailed the Plaintiff the following:

"Thank you, Dr. Rushing, I will provide only pp. 1-2 of the settlement agreement up through the end of paragraph 1(a) along with the retirement account information. If asked, I will also provide information showing my firm's payment of the amount that was initially held in escrow while the attorney lien's [from Paul Strauss and Al Hofeld] were sorted out. I appreciate you getting back to me and am glad that we were able to reach agreement on this."

127. However, the Plaintiff had not in fact agreed to any version of a limited production of a settlement agreement.

128. The Plaintiff responded indicating that he did not agree to a limited production of a settlement agreement.

129. By reason of the aforementioned, the Plaintiff had reason to believe that McGaw had knowingly made a false statement in writing that intended to convey that there was an agreement to a limited production of a settlement agreement when there was in fact no agreement to a limited production of a settlement agreement.

130. Because Henderson Banks and Scott Warner had worked to review the settlement agreement, and because Scott Warner had reached out to Henderson Banks to suppress production of the settlement agreement, when neither Scott Warner or Henderson Banks were parties in the tribunal, and because Scott Warner attempted to get the opposing counsel and the Plaintiff to agree to a limited production of the settlement agreement, the Plaintiff had reason to believe that McGaw had an agreement that was different than the Agreement that the Plaintiff was aware of.

131. Then the Plaintiff went to review correspondence between Henderson Banks and Scott Warner regarding the settlement agreement.

132. An e-mail from Attorney Banks from Nov 5th of 2018 stated the following:

> "Marcus, Please look over these Exhibits and let me know if everything looks fine. I am confirming with Scott [WARNER] that the letters will be added to the letterhead before signing the agreement"

133. The agreed upon Exhibits in that e-mail were entitled "Exhibit A through G".

134. The Plaintiff would later discover that the Settlement Agreement contained Exhibits that the Plaintiff was not aware of, including the following:

    a. Exhibits that contained the defamatory performance evaluations that were conceived by the Defendant when he opposed discrimination, including some of the evaluations in paragraph 34 above.

    b. Further, upon information and belief of the Plaintiff, the settlement agreement that the Plaintiff was aware of stated the following:

"Nor will the following representatives of the Respondents…make, ask or request that others make, or aid or abet others in making, any statements to any third-party regarding Dr. Rushing that are disparaging to his reputation, competence, or good character, which, if publicized, would cause humiliation or embarrassment, or cause the public to question the integrity, competence, or good character of Dr. Rushing"

    c. The Plaintiff contends that the items included in the settlement agreement that the Plaintiff was unaware of were untruthful, disparaging to his reputation, competence, and character.

    d. The Plaintiff contends that inclusion of disparaging items in a settlement agreement as an exhibit when the settlement agreement promises not to disparage a party is an explicit violation of the terms of that agreement, and constitutes a breach of contract.

135. The Plaintiff never agreed and would never have agreed to include performance evaluations that were conceived by the Defendant when the Plaintiff opposed discrimination into a settlement agreement.

136. Both Henderson Banks and Scott Warner either knew or should have known that the Plaintiff would not have agreed to include evaluations conceived when the Defendant opposed discrimination into the settlement agreement.

137. The Plaintiff maintained that concealment occurred in the following manner:

    a. Scott Warner e-mailed Henderson Banks a draft of the final agreement with Exhibits.

    b. The Plaintiff informed Henderson Banks that he agreed with the draft and the Exhibits.

    c. However, at some time after the Plaintiff agreed to the draft and the Exhibits, Scott Warner included Exhibits pertinent to paragraph 34 above into the settlement agreement via an e-mail.

    d. The Plaintiff would later receive a printed copy of the agreement and sign.

    e. Upon information and belief of the Plaintiff, he was signing the draft version with accompanying Exhibits that he had seen and approved.

    f. At that point in time, the Plaintiff relied on the presumed good faith of Henderson Banks and Scott Warner, that he was entering an agreement with the Exhibits that he had consented too.

    g. Inclusion of items that the Plaintiff did not knowingly agree indicates that there was no mutual assent.

    h. Inclusion of items that the Plaintiff did not knowingly agree indicates that there was no good faith or fair dealing in executing the settlement agreement.

138. By reason of the aforementioned, McGaw again breached the aforementioned settlement agreement.

139. The Plaintiff maintains that inclusion of items in paragraph 34 above into the settlement agreement disproportionately favors McGaw and provides no benefit and even continued

harm to the Plaintiff.

140. The Plaintiff maintains that inclusion of items in a settlement agreement that disproportionately favors one party, and then concealing items in a manner such that it deprives the Plaintiff a reasonable opportunity to consent to the concealed items constitutes unjust enrichment, fraudulent concealment, and a breach of contract.

141. The next scheduled Court Date was Dec 28th at 10am, but only the Plaintiff appeared on the Zoom call. The Plaintiff reached out to Judge Forti's Clerk as well as other parties to get clarity. Rather, Judge Forti's Clerk states that the Chancery Foreclosure matter is not to be heard with Judge Forti, even though the Chancery Matter was consolidated into the Civil Matter and had several previous court dates with Judge Forti.

142. Around Dec of 2022, the Plaintiff learned that Judge Forti was an alumnus of Northwestern University.

143. Around this same time (between Oct and Nov of 2022), the Plaintiff noticed an online physician profile through U.S. News and Report that accurately listed his employment with UnityPoint Health, but that incorrectly listed the contact information for McGaw.
    a. Specifically, the address listed for the Plaintiff was 240 E. Huron St.
        i. The aforementioned address was an address for "McGaw"
        ii. "McGaw" would later change its GME office from 240 H. Huron St to 420 E. Superior St.
        iii. The aforementioned phone number, upon information and belief of the Plaintiff, was a contact information for McGaw.
    b. The aforementioned listing would have falsely provided the general public, prospective and current patients the contact information for McGaw when in fact he had no employment affiliation with McGaw at that point in time.
    c. In the context of McGaw's conduct as it related to the ongoing tribunal, the Plaintiff felt intimidated by this publication.
    d. Consistent with the aforementioned, the Plaintiff reported his concern to a supervisor at UnityPoint Health, Dr. Steve Rippentrop.

144. On or around January 5, 2023, the Plaintiff reported McGaw's attorney Scott Warner to the IARDC for concerns regarding unlawful interference in the consolidated tribunal and concerns for fraud.

    a. Though the IARDC complaint was properly delivered to the IARDC, the IARDC never provided confirmation or correspondence regarding this complaint.
    b. Later in 2024, during a hearing for Case No. 2024L00444 in the Circuit Court of Cook County, Presiding Judge Swanagan, an alumnus of Northwestern University, stated to the Plaintiff that there would be bad consequences if the Plaintiff listed Scott Warner as a Defendant. Judge Swanagan denied a Motion to Strike or disqualify Scott Warner of Husch Blackwell as counsel, when he was listed as a party to the complaint. In 2025, the Plaintiff filed a Motion for Substitution of Judge for cause. The Motion did allow for voluntary recusal in lieu of Substitution of Judge for Cause.

Though the Motion for Substitution of Judge was properly filed with appropriate affidavit, Judge Swanagan did not transfer the case for a hearing and determination pursuant to 735 ILCS 5/2-1001(a)(3). Rather, Judge Swanagan transferred the case to Judge Hanlon and a hearing date was set for July 1, 2025. Upon information and belief of the Plaintiff, there was no Order entered from the July 1, 2025 hearing and this was confirmed by the Office of the Clerk of the Circuit Court on or around July 1, 2025 and on or around July 21, 2025. In fact, by Aug 28th of 2025, the Plaintiff learned that the July 1, 2025 hearing date with Judge Hanlon was removed from the online docket altogether, and Judge Swanagan had been reinstated himself back to the case. No proper notice had been given to the Plaintiff regarding any hearings or Orders passed related to the aforementioned. A review of an email sent to the Plaintiff by McGaw's counsel, Husch Blackwell, reviewed on or around Sept 1 of 2025, indicated that Judge Swanagan had reversed an order granting leave to amend a complaint greater than 300 days after the amended complaint was initially granted. The reversal was apparently sua sponte as upon information and belief of the Plaintiff there were no timely submitted and properly noticed motions requesting such relief. Notably, a consequence of removing the amended complaint was that McGaw's attorney, Scott Warner, was also removed as a party from the complaint.

c. By reason of the aforementioned, it appeared that there was an improper influence guiding a judicial officer, who was an alumnus of Northwestern University, as well as an improper influence guiding the processing of an IARDC complaint for McGaw's attorney, Scott Warner, of Husch Blackwell.

d. Because of the extent of improper influence and retaliation that the Plaintiff experienced in the preceding paragraphs, the Plaintiff has reason to believe that McGaw's actual and apparent agents, servants, employees, attorneys, and all persons in active concert or participation, were involved in interfering with the processing of the referenced IARDC complaint.

145. In January of 2023, the Plaintiff reached out to the EEOC office in Illinois to report his concerns.

146. The Plaintiff was informed by an EEOC mediator that he needed to open a new complaint against McGaw to resolve the Plaintiff's concerns.

147. On Jan 10, 2023, the Plaintiff engaged in federally protected activity against McGaw (EEOC #440-2023-02757) to report continued retaliation and breach of the settlement agreement.

148. Upon information and belief of the Plaintiff, one of the primary purposes of entering the agreement was to cease conduct that the Plaintiff to perceived to be retaliatory and unlawful.

149. The Plaintiff maintains that continued conduct that appears retaliatory undermines the entire purpose of the settlement agreement and constitutes a breach of the duty of good faith and fair dealing that should have been inherent to the settlement agreement.

150. On or around Feb 3, 2023, Scott Warner filed an Appearance into the consolidated tribunal

as a third-party on behalf of McGaw.

151. Scott Warner then requested an Order of Protection such that McGaw would not have to disclose the settlement agreement.

152. Upon information and belief of the Plaintiff, the settlement agreement between McGaw and the Plaintiff, indicated that both parties were to respond to court orders and subpoenas when it stated in part that disclosures were permitted if "…required by…law" and by a "…lawful subpoena or court order".

153. The Plaintiff interpreted McGaws's actions in the preceding paragraphs as a willful attempt to evade a subpoena response.

154. Because a Court Order allegedly entered on Nov 9, 2022 and tendered to parties on or around 12/1/2022 had already granted McGaw 28 days to respond to the subpoena, by the time McGaw received said Order, they were already in violation of the Court Order and the Settlement Agreement.

155. By reason of the aforementioned, the Plaintiff had reason to believe that Defendant McGaw was attempting to conceal something about the settlement agreement that they had in their possession from the Court and from the Plaintiff.

156. On or around Feb 8, 2023 asked Judge Forti, an alumnus of Northwestern University, to recuse himself from presiding over the consolidated tribunal due to conflict of interest.

157. Above the Plaintiff's objection, Judge Forti, grants Defendant McGaw's order of protection.

158. The next hearing date per the Nov 9th, Court Order was for March 3, 2023.

159. However, the Plaintiff received correspondence from the attorneys from Huntington Bank in the foreclosure matter stating that the hearing date had been changed to March 6, 2023, instead. Huntington Bank issued an Order via email from the alleged hearing date, but then later recalled that email with the attached order.

160. By reason of the aforementioned in the preceding paragraphs, the Plaintiff had reason to believe that hearing dates were altered without proper notice to the Plaintiff, and hearing date discrepancies existed between the Judge's calendar per the Judge's clerk and the docket calendar for the tribunal, in order to eliminate the Plaintiff from being able to participate in the tribunal.

161. At that point in time, the plaintiff had significant concerns that an unbiased tribunal would be possible.

   a. The Plaintiff reported his concerns regarding Judge Forti to the Judicial Inquiry Board for the Supreme Court of Illinois on or around 2/19/2023.
      i. However, the Plaintiff never receives correspondence from the Judicial

   Inquiry Board or the Supreme Court of Illinois that the complaint was processed.

  b. The Plaintiff reported his concerns to the Office of the Honorable Chief Justice Tim Evans on or around 3/13/23.

162. Additionally, the Plaintiff either reported his concerns or initiated complaints regarding McGaw to the Illinois Department of Human Rights, the Cook County Commission on Human Rights and the City of Chicago Commission on Human Relations.

  G. <u>McGaw requests that the Plaintiff signs a Waiver that is not a part of the Settlement Agreement</u>

163. Sometime between January and February of 2023, McGaw learns that the Plaintiff has a business relationship with Wood Health.

164. Around the same time frame, an employee of the Graduate Medical Education office of McGaw, heretoafter "GME", e-mailed the Plaintiff requesting that the Plaintiff sign a Waiver that appeared to the Plaintiff to request exoneration from some future cause of action.

165. The Plaintiff refused to execute the Waiver and requested that Defendant McGaw cease further contact with the Plaintiff.

166. Defendant McGAW disregards the Plaintiff's request to cease further contact, when on the same day that Judge Forti grants McGaw an Order of Protection, Scott Warner reaches out to the Plaintiff again requesting the Plaintiff to sign the waiver.

167. Upon information and belief of the Plaintiff, no such waiver existed in the Plaintiff's settlement agreement with McGaw.

168. Upon information and belief of the Plaintiff, no such waiver existed in the Exhibits of the settlement agreement with McGaw that were tendered by Attorney Banks.

169. Upon information and belief of the Plaintiff, no such waiver existed in any of the draft settlement agreements tendered by Attorney Banks.

170. The Waiver included language that was not a part of any Settlement Agreement that the Plaintiff was aware of when it stated:

  "I hereby release and forever discharge McGaw including its corporate members, directors, officers, employees, agents, faculty, representatives, affiliates, partners, program directors, assistant program directors from any and all liability whatsoever relating to the release of the information and documents described above including, but not limited to, contract claims, defamation claims, discrimination claims (including, but not limited to, claims based on age, sex, national origin, sexual orientation, religion, race, ancestry, color, disability, harassment, retaliation, and

other legally protected category or characteristic), and/or any other claims whatsoever. This release includes a waiver of all unknown claims."

171. Because the Waiver was sent to the Plaintiff after the Plaintiff engaged in protected activity against McGaw on Jan 10, 2025, and because the Waiver was sent to the Plaintiff in close proximity to McGaw engaging in conduct that was concerning for interference with an ongoing tribunal, and because upon information and belief of the Plaintiff no such Waiver existed in the settlement agreement between McGaw and Plaintiff, and because the Waiver included claims that overlapped with EEOC claims when the Plaintiff had recently filed an EEOC claim against Defendant McGaw on Jan 10, 2025, the Plaintiff had reason to believe that the Waiver was sent to exonerate McGaw from some future claim and to interfere with the rights of the Plaintiff in his newly initiated EEOC claim.

172. By reason of the aforementioned in the preceding paragraphs, the Plaintiff determined that the waiver was unilateral in nature, favoring Defendant McGaw.

173. Upon information and belief of the Plaintiff, the Waiver appeared to be imposing new material terms to the previously signed settlement agreement.

174. Upon information and belief of the Plaintiff, a unilateral waiver or modification of a settlement agreement, introduced after a settlement agreement has been executed is unenforceable and constitutes a breach of that settlement agreement.

H. McGaw Interferes with the Plaintiff's relationship with Wood Health

175. The Plaintiff was sought after and recruited by Independence Health Employer Services to serve as Medical Director for one or more of their clinics.
   a. An e-mail from Mike M. Ariss, VP of Strategic Partnerships at Wood Health and CEO of IHES from 9/27/22 states:

      "Good afternoon Dr. Rushing, Once again, welcome to Wood County Hospital and to Independence Health Employer Services, needless to say that we are thrilled to have you join the team." (See Exhibit "Recruitment")

   b. On the same date Mr. Ariss e-mails the Plaintiff a blank Wood County Hospital employment application.
   c. On 9/29/22, Mr. Ariss requests to Plaintiff via e-mail that all completed application materials should be sent directly to him. (See Exhibit "Application"

176. The Plaintiff signed a contract for employment for Defendant Wood Health on or around Oct 9 of 2022.

177. The Plaintiff completed an application for employment on or around Oct 13 of 2022.

178. The Plaintiff received confirmation from the Wood Health that he was properly credentialed.

179. The Plaintiff received written confirmation from Wood Health that his application for employment had been received.

    a. On October 13, 2022 at 9:42pm the Plaintiff e-mailed a completed application packet to Mike. M. Ariss, VP of Wood Health and CEO of Independence Health Employer Services (hereinafter "IHES"), and copied Chris Lovette, Director of Finance for IHES.

    b. On 10/13/22 at 9:51pm the Plaintiff e-mails Mr. Ariss additional documents in addition to the application packet [see Exhibit "Employment Application"]

    c. On 10/26/22 at 3:37pm the Plaintiff e-mails Mr. Ariss and Mr. Lovette a copy of his Ohio Medical License.

    d. The application contents included a signed credentialing packet, diplomas, IDs, and vaccine/immunization history [see Exhibit "Employment Application"].

    e. Mr. Ariss confirms receipt of the completed application packet via an email to the Plaintiff on Oct 14, 2022 at 9:41AM [see Exhibit "Employment Application"].

180. A copy of the Plaintiff's completed redacted Employment application is included as **Exhibit "Completed Employment Application for Wood County Hospital"**.

181. The Plaintiff indicated on his signed completed employment application a preference to start on or around 3/1/2022.

182. However, correspondence from Becky Edge, Director of Employer Partnerships, inquired if the Plaintiff could start earlier as soon as 11/8/2022 [see Exhibit "Start Date"]

183. On 1/2/2023, Wood Health and the Plaintiff agreed to an earlier start date of 1/17/23 (See Exhibit "Start Date").

184. On 1/7/23, Mike Ariss writes the following to the Plaintiff, while copying the CEO of Wood Hospital, Mike Ariss, and the CEO at that time of The Toledo Clinic, Mike D'Eramo:

> "Good morning Dr. Rushing, First off, welcome to IHES! We are so excited that you have joined our team. As Becky said, we are expecting a lot in 2023 and believe your background and expertise is going to go a long way in helping us get there…I also want to make sure that you get appropriate face time with Physician and Administrative Leadership at both Toledo Clinic and Wood County Hospital…Mike [D'Eramo] Stan [Korducki] please advise as to what specific meetings you want me to make sure Dr. Rushing rotates through…"

185. The Plaintiff moved his family of four from Polk County, IA to Lucas County, OH and began work as the Medical Director for Def Wood Health on 1/17/23.

186. The Plaintiff was qualified for the employment with Wood Health.

187. The Plaintiff completed successfully completed his duties as an employee of Wood Health.

188. The Plaintiff was properly credentialed to work for Defendant Wood Health.

189. The Plaintiff successfully completed all requirements for work pursuant to his employment contract.

190. Because of the aforementioned, the Plaintiff began to receive pay pursuant to the terms of his contract.

191. On or around March 2 of 2023, Defendant McGaw faxed the Waiver from paragraph 163 – 174 above to the Credentialing Corporation of America, LLC.
   a. The Credentialing Corporation of America, LLC was a third-party whom Defendant Wood Health hired to assist with credentialing.

192. Shortly thereafter, around the week of March 13 of 2023, Mike Ariss communicates to the Plaintiff that Mr. Korducki has requested a mandatory meeting with the Plaintiff.

193. On March 16, 2023, the Plaintiff attends the mandatory meeting with Mr. Korducki, Mr. Ariss, and Meghan Makley, Director of Medical Staff Services.

194. During the meeting, the Plaintiff is asked to explain his departure from McGaw.

195. The Plaintiff explained that he departed McGaw due to concerns for discrimination and retaliation.

196. The Plaintiff provided two documents in support of his departure:

   a. An Illinois Department of Employment Security letter from March of 2018 which read:
      "The evidence shows that the claimant [Marcus Rushing] voluntarily left work at MCGAW MED CENTER OF NORTHWESTERN U…because of harassment and discrimination, which caused an undue hardship. The claimant [Marcus Rushing] provide[d] information to support his reason for leaving. The employer was attributable to the cause of separation"

   b. A copy of a race-based threat that was discovered in his performance evaluation that prior to his departure which read:
      "I know that a big part of your character is seeking truth, and it may feel disingenuous to endorse anything that you disagree with. But it will bite you in the ass if you don't learn to concede sometimes to the group, even if they are wrong. You can be completely right, and it won't matter if people have already turned against you. It is a dangerous world for a Black man, and you can't afford to make it more dangerous for yourself by being unable to let things go".

   c. After providing the staff copies of the two documents, Mr. Ariss stated something to

the extent as "that should be sufficient".

d.   However, Megan Makley then begins to mention the Waiver referenced in paragraph 163-174 above.

e.   Mr. Korducki then adds that "we need you to sign the Waiver" sent by McGaw.

f.   At that time, the Plaintiff explained that he could not sign the Waiver because he thought that it would interfere with an ongoing EEOC investigation.

g.   At that time, the Plaintiff was asked if the matter between McGaw and the Plaintiff had been resolved.

h.   The Plaintiff explained that there was an agreement in place between McGaw and the Plaintiff, but that there was still an ongoing matter with the EEOC.

i.   Mr. Korducki asked if he could see the Plaintiff's agreement with McGaw.

j.   The Plaintiff responded that he was unable to provide Mr. Korducki with the agreement, but that he could show the Exhibits from the Agreement.

k.   The Plaintiff opened his computer and showed Mr. Korducki the Exhibits from the Agreement. Among the Exhibits shown were the following:

    i.   A letter of Good Standing signed by the Chair of Family Medicine at McGaw with attached procedural log for medical procedures performed while at McGaw.

    ii.   A letter of recommendation signed by the Family Medicine program director.

    iii.   A letter of recommendation signed by the President and CEO of Erie Family Health Centers.

    iv.   And a letter signed by McGaw and Erie Family Health entitled "RE: Dismissed Patient Complaint Regarding Dr. Marcus Rushing", which read in part:

> "A single patient complaint was received about Dr. Marcus Rushing. This complaint was investigated by the Erie Family Health Compliance Officer. Based on (a) a thorough internal investigation, (b) multiple interviews and (c) lack of evidence, the Erie Family Health Corporate Compliance Officer dismissed the patient complaint and found it to be invalid. The investigation was completed and no corrective action was recommended for Dr. Rushing"

197. The Plaintiff was again asked to sign the Waiver, with the explanation that signing the waiver was needed in order to obtain employment records.

198. The Plaintiff explained that he had already provided consent for Def. Wood Health to obtain access to all employment records when he signed Wood Health's own release of

employment records from their onboarding packet.

199. When it became clear that the Plaintiff would not sign the waiver, the meeting was adjourned.

200. On or around March 22, 2023, Mr. Ariss comes to the Falcon Health Center in Bowling Green, OH where the Plaintiff is providing care for patients.

201. While the Plaintiff is transitioning rooms from one patient to the next, Mr. Ariss requests to speak to the Plaintiff.

202. The Plaintiff explains that he is providing care for patients, but Mr. Ariss insists that he meets with the Plaintiff.

203. The Plaintiff and Mr. Ariss heads to the Plaintiff's office and the following occurs:

   a. Mr. Ariss asked the Plaintiff if he was represented by an attorney,
   b. Mr. Ariss stated that the Plaintiff would be terminated if he did not sign the Waiver.
   c. The Plaintiff explained that he had already signed Wood Health's Waiver for release of records, but that he would be willing to sign a Waiver from McGaw that excluded the exoneration language in paragraph 170 above.
   d. Mr. Ariss stated that he would ask to see if McGaw could remove the exoneration language in paragraph 170 above.
   e. The meeting was adjourned and the Plaintiff resumed caring for patients.

204. On the following day, the Plaintiff e-mailed the ACGME regarding concerns for McGaw's Waiver request (See Exhibit "ACGME Waiver").
   a. In the e-mail the Plaintiff explains that McGaw's waiver request was inconsistent with McGaw's own policy which stated in part that only "...housestaff member[s] who has been subjected to any corrective or disciplinary action...should be asked to sign a waiver/release of liability form"

205. However, the Plaintiff had not been subject to any legitimate corrective or disciplinary action while at McGaw.

206. Specifically, the Exhibit from the settlement agreement from the Family Medicine department chair states in part the following:

> "Disciplinary Action: Dr. Rushing has not been subject to any institutional disciplinary action...Professional Liability...Dr. Rushing was not investigated by any government or other legal body and was not the defendant in any malpractice suit during residency training"

207. Because McGaw's policy only required exoneration language to be included in Waiver's from residents who had been subjected to disciplinary action and the Plaintiff had not been

subjected to any legitimate disciplinary actions, the Plaintiff had reason to believe that the exoneration language creating the specter that the Plaintiff had been subjected to disciplinary action.

208. A waiver request suggesting that the Plaintiff had been subjected to disciplinary action is incompatible with the spirit and terms of the settlement agreement which stated that the Plaintiff had not been subjected to disciplinary action.

209. Further, in Illinois, settlement agreements supersede general employer policies and no such Waiver request with exoneration was included in the Plaintiff's Settlement Agreement.

210. Additionally, the Plaintiff expressed concerns in his letter to the ACGME that McGaw had not sent the aforementioned Waiver request to any employer prior to initiating his EEOC complaint (Jan 10, 2023).

    a. The Plaintiff was employed by Adventist Health after being constructively discharged from McGaw and prior to entering into a Settlement Agreement with McGaw.
        i. Upon information and belief of Plaintiff, no Waiver with exoneration language was sent by McGaw to Adventist and no Waiver with exoneration language was required to be signed by Plaintiff for release of records.
    b. The Plaintiff was employed at HealthPartners from 2019 to 2021and no such Waiver with exoneration language was sent or required to be signed in order for employment record release.
    c. The Plaintiff was employed by Unity Point in 2022 and no such Waiver with exoneration language was sent or required to be signed in order for employment record release.
    d. McGaw released employment records to the University of Minnesota without requiring a signed Waiver release.
    e. McGaw released employment records to the Federation of State Medical Boards without requiring a signed Waiver release.
    f. McGaw released employment records to the IDFPR without requiring a signed Waiver release.

211. Because of the aforementioned in preceding paragraphs, the Plaintiff had reason to believe that McGaw's purpose for sending the Waiver request to Wood Health was to negatively interfere with the Plaintiff's employment by creating the specter that the Plaintiff had been subjected to disciplinary action.

212. Again, on or around March 30, 2023, Mr. Ariss requests to meet with the Plaintiff.

213. At the meeting, Mr. Ariss appearing frustrated and upset, again asks the Plaintiff to sign the Waiver.

214. The Plaintiff asks for an update if McGaw had agreed to remove the exoneration language from the Waiver.

215. Mr. Ariss then stated that McGaw was unwilling to modify their waiver.

216. The Plaintiff again explained to Mr. Ariss that he felt that by signing a waiver with the exoneration language that he would be interfering with his right to engage in federally protected activity.

217. Between April 5th and April 6th of 2023, Mr. Korducki leaves several voice messages on the Plaintiff's phone requesting that the Plaintiff return a call to discuss the McGaw Waiver.

218. During a phone call with Mr. Korducki on April 6th of 2023, the following occurs:

   a. Mr. Korducki explains to the Plaintiff that a signed waiver was needed to make sure that the Plaintff was "qualified as a physician".
   b. The Plaintiff explains to Mr. Korducki that his Board Certificaiton, Medical Licensure, successful completion of specialized training in his medical subspecialty, various other certifications, as well as completion of his duties as Medical Director were proof that the Plaintiff was "qualified as a physician".
   c. Mr. Korducki then pivots and explains that the signed Waiver was needed to make sure that there were no "disciplinary actions" against the Plaintiff.
   d. The Plaintiff explained to Mr. Korducki that he was licensed in several states with zero malpractice claims and had no pending, past or future disciplinary actions with any previous employer or training program.
      i. Futher, the Plaintiff had already showed Mr. Korducki an exhibit from the settlement agreement from McGaw that stated that Plaintiff had no disciplinary actions (see paragraph 206 above)
   e. Mr. Korducki then pivots again and explains that the signed Waiver was needed because none of the Plaintiff's previous training experiences had been verified by credentialing. However, during the same phone call, Mr. Korducki would later recant that statement by stating that he did not in fact know what credentialing items were missing.
      i. The Defendant at that point in time had in fact received verification from all previous employers "see Exhibit FSMB".
      ii. The Federation Credentials Verification Service (heretoafter "FCVS"), operated by the Federation of State Medical Boards (heretoafter "FSMB), confirmed that they sent all verifications to Wood Health and even submitted a second time without charge upon request of the Plaintiff.
         1. FCVS is a centralized, primary-source credentials verification service for physicians
         2. The FCVS verifies Postgraduate training (residency/fellowship), Medical School transcripts and diplomas, examination history as well as identity documents (passport, social security, etc)
         3. An e-mail sent by the FCVS to the Plaintiff on or around 2/28/23 stated the following:
            "Hello Dr. Rushing...Your profile was completed and mailed to Wood County Hospital...on 2/16/23"
         4. The FCVS profile sent to Wood Health on or around 2/16/23 would have already contained the requested employer verifications from

McGaw, the University of Chicago, HealthPartners and any other post-graduate training experience.

f. Mr. Korducki then pivots and states that the signed Waiver was needed for credentialing in order to bill for services.

g. The Plaintiff explained to Mr. Korducki that the Plaintiff was successfully credentialed with the Ohio Bureau of Workers Compensation System since starting in January of 2023.

   i. Of note, the Plaintiff was an Occupational Medicine physician and his professional services are billed under State Workers Compensation insurance, not from private insurance.

   ii. Though the Plaintiff had no contractual obligations to be credentialed with private insurers, he was in fact properly credentialed with several third-party insurers.

      1. Janette Gee, VP for Insurance Credentialing at Wood Health, would later confirm that the Plaintiff had been successfully credentialed with the State Workers Compensation as well as several third-party insurers.

      2. Correspondence from the Ohio Department of Insurance also confirmed that the Plaintiff was properly credentialed with several insurers.

   iii. Wood Health had already been billing for Occupational Medicine professional services rendered by the Plaintiff since January of 2023.

   iv. At that point in time Wood Health also had the capacity to bill third-party insurers for non-Occupational Medical services as the Plaintiff was properly credentialed.

h. Mr. Korducki then pivots and explains that the signed Waiver was needed in order to complete credentialing for Wood County Hospital.

   i. Upon information and belief of the Plaintiff, there was nowhere in Wood Health's policy or in their contract that required Plaintiff to sign a Waiver with exoneration language.

   ii. The Plaintiff had already signed Wood Health's own Waiver consenting to release of employment records.

      1. Becky Edge, an executive with IHES, would later explain to the Plaintiff that if Wood Health had a problem with Plaintiff's credentialing or application that the Plaintiff could simply just get credentialed separately with IHES or The Toledo Clinic.

      2. The Plaintiff was the Medical Director for Occupational Medicine and Employee Health for IHES, Wood Health and the Toledo Clinic.

      3. The Plaintiff had Medical Director duties for Wood Health, The Toledo Clinic, and IHES.

i. The Plaintiff restated that he did not feel comfortable signing the waiver and Mr. Korducki.

j. Mr. Korducki requested an in-person meeting regarding the Waiver.

k. The Plaintiff asked Mr. Korducki if the Plaintiff should bring an attorney to that meeting.

l. Mr. Korducki responded by stating "that no attorney would be needed" and "I'm on

your side". Mr. Korducki then ended the call.

I. Wood Health acknowledges that McGaw's Waiver was not a part of Wood Health's routine credentialing process and that the Waiver request was likely tied to Plaintiff engaging in Protected Activity against McGaw

219. On or around April 7 of 2023, Mr. Korducki sends an email to the Plaintiff stating the following:
"Dr. Rushing, Thanks for the follow up email...I am not specifically aware at the moment what responses have been received from the various institutions except for McGaw Northwestern. McGaw has not responded to our normal request even with your signed release on our standard credentialing form. They returned an authorization and release of their own instead. Thanks for expressing your concerns about that document [the Waiver]. This is a bit different from our usual experience in the credentialing process which is probably tied to the EEOC matter that you shared. As I mentioned, we'll reach out to our counsel to identify an approach to obtain the information we normally ask of each institution..."

220. However, Wood Health had already received the information normally requested of physician employees, when the FSMB sent the Plaintiff's employment verification to Wood Health on 2/16/23.

J. Wood Health engages in Unlawful Employment Practices

221. Defendant Wood Health acknowledged on more than one occasion that the Plaintiff had engaged in protected activity.

222. Upon information and belief of the Plaintiff, he was the only Black/African American employee at IHES or Wood Health's Employer Servies Program.

223. From January to around March of 2023, the Plaintiff was a part of the IHES Executive Team, which also included Becky Edge, Mike Ariss, and Chris Lovette.

224. Mr. Ariss dismantles the IHES Exec Team and replaces it with an OPS Team, that excludes the Plaintiff.

225. Upon information and belief of the Plaintiff, the IHES exec team was the front facing team that interacted with Occupational Medicine clients.

226. As the Medical Director, the Plaintiff, previously attended IHES Exec Team meetings with IHES clients and prospective Clients.

227. Some of the clients began to inquire why the Medical Director was no longer present at the IHES Exec Team meetings, when their sole purpose for partnering with IHES instead of other Occupational Medicine competitors was because they had a Board-Certified Medical Director.

228. The exclusion from participation of IHES meetings essentially reduced the Plaintiff from Medical Director, to simply physician employee.

229. The Plaintiff perceived the aforementioned to be a de facto demotion.

230. The Plaintiff had participated in the interview and hiring of a physical therapist, Jane Doe #1, to be supervised by Becky Edge.

231. However, when Mr. Ariss abolished the IHES Exec Team, he promoted Jane Doe#1, a physical therapist, to a member of the OPS team, and then would later appoint Jane Doe #1 to supervise the Plaintiff, who was a Board-Certified Physician and Medical Director for the Defendant.

232. Mr. Ariss then limits communication with the Plaintiff.

233. Previously, as a member of the IHES executive staff, the Plaintiff and Mr. Ariss either met, texted or had phone calls several times per week.

234. The Plaintiff's request to meet with Mr. Ariss are ignored.

235. On or around April 5, 2023, a Nurse Team Lead, Jane Doe #2, informs the Plaintiff that Mr. Ariss asked her to keep track of when the Plaintiff completed clinic notes.

236. Previously, the Plaintiff supervised all other health professionals in IHES, including Jane Doe #2.

237. The Plaintiff perceived the aforementioned to be a de facto demotion as well hyperscrutiny.

238. On April 10, 2023, on Jane Doe #1's first day of work, she tells the Plaintiff, "Dr. Rushing we need you to see more patients. We did not pay you all of this money to 'think'. We paid you to see patients.

239. The comment regarding the quantity of patients seen suggested to the Plaintiff that Jane Doe#1 had access to and discussion about performance metrics for the Plaintiff.

240. Prior to that statement, the Plaintiff had no knowledge of any unsatisfactory performance issues.

241. Further, the Plaintiff, being a Medical Director, had no contractual obligation, or contractual incentive, to see a specified number of patients per day.

242. Further, at that point in time, upon information and belief of the Plaintiff, the Plaintiff was never informed that Jane Doe #1 was a direct supervisor of the Plaintiff.

243. The Plaintiff felt disrespected and humiliated by the aforementioned. The Plaintiff

communicated his concerns to Becky Edge and requested to meet with Mr. Ariss.

244. Shortly thereafter, Mr. Ariss requests that Becky Edge and Jane Doe #1 monitor the Plaintiff. Both Becky Edge and Jane Doe #1 begin to set office hours wherever the Plaintiff has clinic. For example, if the Plaintiff was seeing patients at the Falcon Health Center (operated by Wood Health) in Wood County, then both Becky Edge and Jane Doe#1 would set office hours at that location. The same would be true when the Plaintiff was seeing patients at the Fallen Timbers Clinic (operated by The Toledo Clinic) in Lucas County.

245. Becky Edge is then granted access to view the Plaintiff's electronic work calendar.

246. Jane Doe #1 then begins to intercept e-mails from employer partners and clients that were addressed to the Medical Director, when Jane Doe #1 was not the medical director or a licensed physician.

247. The Plaintiff began to notice that Jane Doe #2 began entering the rooms of patients that the Plaintiff had discharged and began asking leading questions regarding their subjective experience with the Plaintiff.

248. The Plaintiff believed that the increased monitoring was an attempt by Defendant Wood Health to search for a pretextual reason to discipline or terminate the employee.

249. An executive staff member at The Toledo Clinic asked the Plaintiff to listen in on a Teams Meeting hosted by Mr. Ariss.

    a. The Plaintiff was not asked to attend this Teams Meeting.
    b. During this Teams meeting, the Plaintiff over hears and sees Mr. Ariss discuss the Plaintiff's performance evaluation openly with members of the team that the Plaintiff had previously supervised.
    c. At that point in time, the Plaintiff had not been formally notified of any discrepant performance issues.
    d. Mr. Ariss had not yet himself given the Plaintiff an opportunity to view any alleged performance issues.
    e. During the meeting, Mr. Ariss compared the patient volumes seen by a Nurse Practitioner, whom the Plaintiff directly supervised, and the patient volumes seen by the Plaintiff.
    f. One of the Plaintiff's jobs as Medical Director was to provide supervision to several Nurse Practitioners at both the Falcon Health Center in Wood County (operated by Wood Health) and the Fallen Timbers Health Center (operated by The Toledo Clinic) in Lucas County.

250. The same executive member from The Toledo Clinic showed the Plaintiff a clinic schedule proposed by Mr. Ariss that would place the Plaintiff exclusively at the Falcon Health Center.
    a. At that point in time, the Plaintiff had patient, supervisory, and medical director responsibilities for both The Toledo Clinic and Wood Health.

b. The Plaintiff believed that this move occurred to position the Plaintiff in Wood County for additional monitoring.

251. On or around 4/25/23, Mr. Ariss asks Chris Lovette to accompany the Plaintiff on a proprietary worksite walkthrough for one of the clients for IHES. The corporate partner specifically requested that only the Medical Director attend this walkthrough and requested that only the Plaintiff be allowed on their premises for the walkthrough. Mr. Lovette would then use the decision by the corporate partner to file a complaint against the Plaintiff.

252. By reason of the aforementioned, the Plaintiff had reason to believe that the increased monitoring was pretextual and intended to look for ways to punish or discipline the Plaintiff, as had occurred in paragraph 251 above.

253. The Plaintiff had requested to meet with Human Resources, Mr. Korducki (CEO of Wood Health), Mr. Ariss (CEO of IHES) and Mr. D'Eramo (CEO of the Toledo Clinic) regarding the change in work environment.

K. McGaw communicates Plaintiff's Place of Employment to the Opposing Counsel in a Civil Tribunal

254. On or around May 5, 2023 Wood Health posts the Plaintiff's exact physical address on their website.

255. At that point in time, no other Wood Health physician had their address posted on the website.

256. Around 3 days later on May 8, 2023, the January Law firm e-mails Wood Health the Uniform Order of support from paragraph 111-119 above.

257. McGaw had knowledge of the Plaintiff's place of employment.

258. McGaw had been in contact with the Plaintiff's place of employment.

259. McGaw had already been in contact with the opposing counsel in Case 2019D8356.

260. McGaw had filed into Case 2019D8356 in February of 2023.

261. McGaw had been in contact with Mr. Korducki and Mr. Ariss regarding the Waiver.

262. The Plaintiff had reason to believe that McGaw communicated the Plaintiff's place of employment to the court, but intended to conceal this fact. The Plaintiff believes that McGaw requested of Wood Health to post his address online to make it seem like members of the court discovered his employment de novo and without assistance of McGaw. The Plaintiff believes that this occurred when the Plaintiff refused to sign the Waiver exonerating McGaw.

L.  Wood Health acknowledges communication with Judge Forti, Scott Warner and the Opposing Counsel in Case 2019D8356

263. While the Plaintiff was on bereavement leave, the HR department requests to meet with the Plaintiff and proposed a meeting date of 5/16/23.

264. The Plaintiff had previously requested to meet with HR to discuss changes in work environment, but no responses were received to those requests.

265. The meeting on 5/16/23 took place in the HR department of Wood Health and was attended by Kara Trombley and Elizabeth Foreman. Mike Ariss also showed up to the meeting, but was asked to step outside for the first part of the meeting.

266. At the beginning of the meeting HR informed the Plaintiff that they had been in contact with Judge Michael Forti, McGaw's attorney Scott Warner, and the January Law Firm, the opposing counsel in Case 2019D8356.

    i. At the meeting the Plaintiff reported the items in paragraphs 191 – 253 above.
    ii. The Plaintiff reported concerns that he believed the aforementioned occurred because he refused to sign a waiver exonerating McGaw, when he had recently filed an EEOC claim against McGaw
    iii. After the Plaintiff reported his concerns, HR asked Mr. Ariss to enter the room.
    iv. HR then informs the Plaintiff that Mr. Lovette filed a complaint alleging that the Plaintiff refused to allow Mr. Lovette to accompany him on a worksite walkthrough.
    v. The Plaintiff explained that the company, and not the Plaintiff, requested that Mr. Lovette not attend the Worksite Walkthrough.

M.  The Plaintiff engages in Protected Activity against Defendant Wood Health

267. The following day on 5/17/23, the Plaintiff initiates both a complaint with the Ohio Office of Civil Rights Commission as well as the EEOC.

268. After posting the Plaintiff's mailing address online, Defendant Wood Health starts to receive mail on behalf of the Plaintiff from UnityPoint Health, Henderson Banks, as well as Court documents from Case 2019D8356.

269. The Plaintiff already had an appropriate service address for court documents for Case 2019D8356.

270. When the Plaintiff would report to his office at Falcon Health Center, there would be opened mail with Court documents displayed conspicuously on his desk.

271. The Plaintiff reported his concerns to HR.

272. The Plaintiff also asked staff who had opened and placed mail on his desk.

273. Jane Doe #1 informs the Plaintiff that Mike Ariss has requested that the Plaintiff's mail be collected and delivered directly to him and not the Plaintiff.

274. Because the conduct continued to occur, the Plaintiff reported (Case No. 2023-05-0032) his concerns to the Bowling Green State University police department (hereinafter "BGSU").

275. The BGSU police opened a complaint on the Plaintiff's behalf with the U.S. Postal Inspector General. [See Exhibit "BGSU"]

276. The Plaintiff then took photos of the mailed items that he had in possession and forwarded them to the U.S. Postal Inspector General (Case #51431672)

277. A day after the Plaintiff filed his last BGSU report, the Plaintiff received a termination letter.

278. A hand-delivered letter on Wood Health letter-head was provided to the Plaintiff on or around 6/6/23 while he was at his office at the Fallen Timbers Clinic.

    a. The letter stated the following:
       "Because your application remains incomplete, the Hospital is unable to proceed with processing your application. Accordingly, as of today's date your application is deemed withdrawn".

279. The Plaintiff called Wood Health HR to ask for clarity regarding whether the Plaintiff was terminated.

280. HR stated that they were not aware of any communication suggesting that the Plaintiff was terminated or not.

281. The Plaintiff then proceeded to Falcon Health Center and asked Becky Edge if she had any knowledge on whether or not the Plaintiff had been terminated. Mrs. Edge stated that she was unaware of any termination.

282. The next day, on June 7, 2023 at around 10:39am, Mr. Ariss sends an email to the Plaintiff entitled "Notice of Termination of Employment with Wood Health Company".

Defendant's Pre-Textual Allegation regarding Termination due to Incomplete Application

283. At all relevant times, Plaintiff was a licensed physician employed by a new employer, Wood Health, located in the State of Ohio.

284. At the time of hire, Plaintiff fully and accurately completed all required employment application materials, including all disclosures necessary to facilitate credentialing.

285. Approximately (9) months after submission of his completed application, and six (6) months into his employment, and after the Plaintiff had filed both an OCRC and EEOC complaint against Defendant Wood Health, and a day after filing 3 police reports against the Defendant for tampering with personal mail pertinent to a legal proceeding involving the Plaintiff and not the Defendant, the Plaintiff was abruptly terminated by Defendant.

286. Defendant would assert that Plaintiff's employment was terminated due to an "incomplete application." However, this justification was patently false, as Plaintiff had in fact completed all application materials and credentialing documents, which were received both the Defendant and the Defendant's own credentialing subcontractor.

287. The "incomplete application" rationale was only first raised after Plaintiff refused to sign a waiver containing exoneration language related to ta pending EEOC complaint Plaintiff had filed against a former employer.

288. Defendant was fully aware of Plaintiff's protected activity, including his EEOC complaint against the former employer. Defendant was also aware that it was requesting the waiver after Plaintiff had already signed a standard record release, which permitted the transmission of employment documents from the former employer without exoneration language of waiver of claims.

289. Despite already having access to all necessary credentialing records – including verification directly from a state-recognized primary source credentialing agency – Defendant insisted that the waiver must be signed, repeatedly pressuring Plaintiff to execute it.

290. Defendant provided inconsistent explanations for its insistence on the waiver:
    a. Initially, claiming it was needed to prove that the Plaintiff was "qualified as a physician;
    b. Then asserting that it was needed to ensure that there were no "disciplinary actions" against the Plaintiff;
    c. Then asserting that it was needed because none of his previous training had been verified by credentialing;
    d. Then asserting that it was needed in order to bill for services;
    e. And ultimately stating that the waiver was needed to complete credentialing for Wood County Hospital.

291. Plaintiff verified with the relevant institutions and the credentialing agency that all requested records had in fact been transmitted and received by Defendant or its credentialing contractor.

292. The credentialing agency hired by Defendant also confirmed that it received employment records.

293. Plaintiff repeatedly communicated this information to Defendant and reiterated that
    a. A valid record release had already been signed;
    b. All records were received via the primary source credentialing agency;

c. The waiver with exoneration language was both unnecessary and would compromise his active EEOC complaint.

294. Plaintiff made clear that signing such a waiver could constitute a waiver of rights and would serve to infringe upon his legal protections against retaliation under federal law.

295. Plaintiff's refusal to sign the waiver constituted opposition to retaliatory conduct and was a form of protected activity under ORC § 4112 and federal anti-retaliation laws.

296. In response to Plaintiff's protected opposition, Defendant engaged in a pattern of retaliatory conduct, including:
   a. Creating a hostile work environment;
   b. Intruding upon Plaintiff's personal privacy by interfering with his personal legal matters;
   c. Interfering with judicial proceedings to which Plaintiff was a party;
   d. Effectively demoting Plaintiff by removing duties and undermining his professional standing;
   e. And ultimately, wrongfully terminating his employment.

297. Despite benefiting from Plaintiff's work and services for (6) months after receipt of all credentialing documents, and nine (9) months after submission of his completed employment application, Defendant terminated Plaintiff on the false and pretextual basis that his application had been "incomplete."

298. Defendant's shifting and inconsistent justifications for demanding the waiver – coupled with documentary evidence showing complete credentialing and record receipt – demonstrate that its stated reason for termination was not credible and served as **pretext** for unlawful retaliation.

299. Defendant Wood Health's actions were willful, malicious, and in direct response to Plaintiff's assertion of his civil rights.

Ongoing Retaliation including Interference with Legal Counsel, Professional Licensure

300. Shortly after termination, Defendant UnityPoint filed a frivolous complaint against Plaintiff with the Iowa Medical Board.

301. The Board determined the complaint was without merit.

302. Nevertheless, the complaint remains on Plaintiff's record to this day.

303. The frivolous complaint continues to impair Plaintiff's employment opportunities.

304. Because of the aforementioned, the Plaintiff engaged in protected activity and filed an EEOC complaint against UnityPoint.

305. Throughout these events, Plaintiff retained multiple attorneys to represent him.

306. Defendants interfered with Plaintiff's attorney-client relationships.

307. Upon termination, the Plaintiff retained Kim Dodson to represent the Plaintiff in the matters against Defendants McGaw and Wood Health.

308. Around the same time, an Attorney Darrel Dunham called the Plaintiff stating that he was interested in representing the Plaintiff.

309. Upon information and belief of the Plaintiff, the Plaintiff had not first reached out to consult Attorney Dunham.

310. The Plaintiff then entered into a contractual relationship with Attorney Dunham.

311. Attorney Dunham expressed to the Plaintiff that he was interested in representing the Plaintiff in the divorce tribunal as well as the EEOC claims.

312. Attorney Dunham began to solicit information pertinent to the EEOC matters for Defendants McGaw, Wood Health and UnityPoint.

313. The Plaintiff disclosed to Attorney Dunham that Attorney Dodson was representing the Plaintiff in the EEOC matters for McGaw and Wood Health.

314. After the Plaintiff disclosed to Attorney Dunham his counsel in the EEOC matters, Attorney Dodson then states that she will no longer be representing the Plaintiff against McGaw.

315. Because the complaints were related, and because Attorney Dodson refused to litigate against both Defendants, when there were contingency agreements in place to litigate against both Defendants, Plaintiff terminated the attorney's representation.

316. Because Attorney Dunham had solicited information pertinent to the EEOC matters and because he had expressed interest in representing the Plaintiff in all matters, the Plaintiff asked Attorney Dunham if he could represent the Plaintiff in the EEOC matters.

317. Attorney Dunham never responded to this request.

318. Attorney Dunham was asked to file an appeal of the Default Judgement against the Plaintiff.

319. Instead, Attorney Dunham filed a Motion to Vacate the Default Judgement.

320. The Plaintiff had received a Right to Sue Defendant McGaw.

321. The Right to Sue McGaw was about to expire.

322. Around this same time, Judge Forti then enters a Body Attachment Order against the

Plaintiff.

323. The Judge was aware that the Plaintiff was unemployed as a Motion to Modify Support had been filed.

324. Judge Forti refuses to hear a Motion to Vacate and instead sets a hearing for Body Attachment against the Plaintiff.

325. Around this time, and just before the hearing, the Plaintiff enters into contingency agreement between Willis, Spangler Starling in Ohio to litigate against Defendants McGaw and Wood Health.

326. During a phone call, the Plaintiff informs Attorney Dunham of his new counsel and Attorney Dunham responds "That, I needed to know", and hangs up.

327. Attorney Dunham failed to file Exhibits that Plaintiff requested, including proofs of child support payments.

328. Attorney Dunham failed to file a Motion for Substitution of Judge for Cause against the presiding Judge.

329. The Plaintiff discovered that Attorney Dunham was communicating with Scott Warner, attorney from McGaw.

330. Attorney Dunham disclosed Plaintiff's medical information, including a stress-induced cardiac event.

331. Attorney Dunham disclosed Plaintiff's private address to Defendant McGaw and opposing counsel without authorization.

332. Attorney Dunham disclosed items to the presiding Judge without the Plaintiff's knowledge or consent.

333. Attorney Dunham's disclosures harmed the Plaintiff's case and privacy rights.

334. Plaintiff reasonably believed his Illinois attorney as acting in Defendant McGaw's best interest.

335. The Plaintiff terminated attorney Dunham's representation.

336. Willis, Spangler and Starling (heretoafter "Willis Firm") refused to file a federal complaint upon receiving the EEOC right to Sue letter for McGaw, as requested.

337. The Willis Firm instead filed a separate OCRC charge against Defendant McGaw.

338. In the OCRC charge, the Willis Firm inputs a date of 2018 and includes the wrong charge,

when the Plaintiff explained and when an issued EEOC Right to Sue Letter had input that this was for retaliation that occurred in January of 2023.

339. The Plaintiff reported his concerns regarding the aforementioned directly the EEOC as well as to the OCRC.

340. The Willis Firm refused to submit supporting evidence to the OCRC.

341. Two right-to-sue letters were issued to the Willis Firm for Defendants McGaw and Wood Health.

342. However, the Willis Firm refused to file a complaint in state or federal court.

343. The Plaintiff believes that Defendant McGaw and Defendant Wood Health colluded to interfere with his legal counsel.

344. Because no attorney that the Plaintiff had reached out to in Illinois or Ohio was willing to sue Defendants McGaw and Wood Health, the Plaintiff searched for attorneys outside of Illinois and Ohio.

345. The Plaintiff entered into a contingency agreement with Attorney Ramon Martin of the Justice Law Firm in Alabama.

346. Attorney Ramon Martin had secured pro hac vice counsel with an attorney in Columbus, OH.

347. However, when upon signing the contingency agreement, the pro hac vice attorney backed out, and Attorney Martin severed the attorney client relationship.

348. The Plaintiff was left without representation.

349. Plaintiff's ability to pursue legal remedies was further compromised.

350. The Plaintiff believed that Defendant McGaw and Defendant Wood Health colluded to interfere with his legal counsel.

### False Online Profiles, Collusion, Blacklisting, and Professional Destruction in Continued Retaliatory

351. Collectively, Defendants engaged in a coordinated campaign to blacklist Plaintiff.

352. Defendants shared information about Plaintiff's protected activities and whistleblowing.

353. Defendant accessed Plaintiff's PECOS CMS file to monitor his professional activities.

354. Defendnats sought to prevent Plaintiff from forming independent business relationships.

355. Because of the aforementioned, Plaintiff organized a business under his own name.

356. Plaintiff registered a domain using his name.

357. Shortly thereafter, misleading Google search engine results appeared under Plaintiff's name.

358. These results again listed former employers as Plaintiff's contact information.

359. One of the results was a published administrative hearing that had allegedly occurred in Polk County, Iowa.

360. Statements included in this proceeding disparaged the Plaintiff's medical judgement.

361. The Plaintiff was never informed of the hearing.

362. The statements were made without the Plaintiff's knowledge or opportunity defend himself.

363. Defendants ensured that Plaintiff's own business website was suppressed in search results.

364. Defendants thereby diverted business, referrals and professional contacts.

365. Defendants filed false reports with medical boards.

366. Plaintiff's Illinois license was canceled without hearing.

367. Illinois authorities reported the cancellation to the National Practitioner Data Bank.

368. Reports alleged Plaintiff was delinquent in child support.

369. The child support order arose from a tribunal proceeding tainted by fraud and by Defendant McGaw and Defendant Wood Health's interference.

370. The same tribunal judge had refused to recuse himself despite conflicts of interest.

371. Plaintiff's reputation was destroyed among colleagues, employers, and licensing boards.

372. Plaintiff suffered financial ruin.

373. Plaintiff also suffered a stress-induced cardiac event requiring hospitalization.

374. Plaintiff continues to experience severe emotional distress.

375. Plaintiff has been unable to secure comparable employment in medicine.

376. Defendants' coordinated actions have permanently impaired Plaintiff's professional and

personal life.

### A. Regarding the Count of Fraudulent Inducement (Defendant McGaw)

377. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.
378. Defendant knowingly made false and threatening representations – including that a patient complaint would be used to obstruct his career – for the purpose of inducing Plaintiff to enter into a settlement agreement.
379. Defendant's representations were made with the intent to cause fear and coerce Plaintiff into waiving legal claims.
380. Plaintiff reasonably relied upon these threats under duress.
381. As a result, Plaintiff suffered damages including reputational harm, job loss, and economic loss.

### B. Regarding the Count of Fraudulent Misrepresentation (Defendant McGaw)

382. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.
383. Defendant falsely represented the nature and completeness of the settlement and its exhibits.
384. Defendant intentionally failed to disclose the inclusion of a damaging exhibit, materially altering the agreement.
385. Plaintiff relied on Defendant's misrepresentations when executing the agreement.
386. As a result, Plaintiff suffered harm including damage to reputation, emotional distress, and employment interference.

### C. Regarding the Count of Fraudulent Concealment (Defendant McGaw)

387. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.
388. Defendant had a duty to disclose the complete contents of the settlement agreement, including all exhibits.
389. Defendant actively concealed the inclusion of a damaging exhibit and failed to disclose that the exhibit had been attached.
390. Plaintiff signed the agreement without knowledge of the concealed materials.
391. The concealment was intentional, material, and caused Plaintiff direct and foreseeable harm.

### D. Regarding the Count of Material Misrepresentation (Defendant McGaw)

392. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.
393. Defendant's statements and omissions regarding the settlement agreement, the waiver, and the nature of post-employment communication were material to Plaintiff's decision to sign.
394. The misrepresentation were knowingly false or made the reckless disregard for the truth.
395. Plaintiff relied on these representations to his detriment.

E.  Regarding the Count of Unjust Enrichment (Defendant McGaw)

396. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.
397. Defendant obtained the benefit of a one-sided settlement agreement under duress and fraud, while continuing to engage in retaliatory and damaging conduct.
398. Defendant retained benefits including waiver of legal claims, goodwill, and professional concessions from Plaintiff without honoring the agreement's terms.
399. It would be inequitable for Defendant to retain these benefits under such circumstances.

F.  Regarding the Count Breach of Settlement Agreement; Partial Performance (Defendant McGaw)

400. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.
401. The Settlement Agreement constituted a valid and enforceable contract.
402. Plaintiff performed all obligations under the agreement.
403. Defendant breached the agreement by:
    a.  Concealing a material exhibit;
    b.  Continuing to retaliate against Plaintiff;
    c.  Attempting to require an unauthorized Waiver;
    d.  Interfering with post-employment opportunities in violation of the spirit and terms of the Agreement
404. Plaintiff suffered damages as a direct and proximate result of Defendant's breach.

G.  Regarding the Count of Tortious Interference with a Business Relationship (Defendant McGaw)

405. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.
406. At all relevant times, Plaintiff was a licensed physician employed by a new employer, Wood Health, located in the State of Ohio.
407. Plaintiff had entered into a valid and beneficial business and employment relationship with this new employer and was actively working in a medical or healthcare-related position.
408. The Plaintiff had previously been employed by Defendant McGaw and had entered into a settlement agreement resolving claims related to that prior employment relationship.
409. After Plaintiff filed a new EEOC complaint against Defendant McGaw alleging retaliation and breach of the settlement agreement, Defendant learned of the filing and took retaliatory steps against Plaintiff.
410. Specifically, Defendant contacted Plaintiff's new employer and insisted that Plaintiff sign a Waiver in Order for required employment or credentialing records to be released to the new employer.

411. The Waiver:
    a.  Contained exoneration language not found in the original settlement agreement;
    b.  Misleadingly implied that the Plaintiff had been disciplined or subjected to

performance issues when no such disciplinary action had occurred;

c. Suggested that Plaintiff was waiving any rights or claims related to the new EEOC complaint;

d. Was not required by the original Settlement Agreement, and was created unilaterally by Defendant after the EEOC filing.

412. Defendant refused to release employment or credentialing records unless and until Plaintiff signed this Waiver – even though such records were contractually or ethically required to be provided upon request and not conditioned on signing any additional documents.

413. The Defendant also refused to remove the exoneration language from the Waiver request.

414. Plaintiff reasonably refused to sign the waiver because:

a. It would have compromised his pending EEOC claim;

b. It contained false or misleading representations;

c. Signing it would have been an act of further retaliation and waiver of rights.

415. As a direct result of Defendant's refusal to cooperate and provide records unless the waiver was signed, Plaintiff's new employer terminated his employment based on the alleged inability to receive required documentation.

416. Defendant had actual knowledge of Plaintiff's relationship with the new employer and knew or should have known that interfering with the record transmission would jeopardize Plaintiff's employment.

417. Defendant had no legal justification or privilege to condition record release on the execution of a waiver not contemplated by the original settlement agreement.

418. Defendant's actions were intentional, malicious, and retaliatory, and were designed to interfere with Plaintiff's prospective economic advantage and continued employment.

419. As a direct and proximate result of Defendant's interference, Plaintiff suffered:

a. Loss of employment;

b. Loss of Income and benefits;

c. Reputational harm in the professional community;

d. Emotional distress and humiliation;

e. Other damages to be proven at trial.

H. Regarding the Count of Tortious Interference with Attorney-Client Relationships (Defendant McGaw and Defendant Wood Health)

420. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

421. Plaintiff entered into attorney-client relationships with Illinoi, Ohio and Alabama counsel.

422. Defendants intentionally interfered with these relationships.

423. Defendant McGaw's counsel incentivized and/or pressured Plaintiff's attorneys not to pursue file claims in court.

424. Defendant Wood Health pressured incentivized and/or pressured Plaintiff not to file claims in court.

425. Defendant's interference caused Plaintiff to lose legal representation and remedies.

426. Plaintiff suffered damages including the loss of some claims.

I. Regarding the Count of Violation of Illinois Human Rights Act, 775 ILCS 5/2-102, 6-101, 2-102(B)(1), 8-111 (Defendant McGaw)

427. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

428. Plaintiff engaged in protected activity by opposing discrimination and retaliation.

429. Defendant McGaw retaliated against Plaintiff by breaching the settlement agreement and interfering with tribunal litigation.

430. Defendant McGaw's conduct was motivated by unlawful discrimination.

431. Plaintiff suffered lost wages, reputational harm, and emotional distress.

    J.   Regarding the Count of Violation of Illinois Whistleblower Act, 740 ILCS 174 §§ 15, 20, 20.1, 25

432. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

433. Plaintiff disclosed and opposed practices by Defendant McGaw, and officers of the state of Illinois, and attorneys that were licensed in Illinois that he reasonably believed violated law.

434. Plaintiff was retaliated against in part for these disclosures, including through interference in tribunal proceedings and blacklisting.

435. Defendant McGaw's actions violated the Illinois Whistleblower Act.

    K.   Regarding the Count of Violation of Illinois Right of Publicity Act, 765 1075 (Defendant McGaw)

436. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

437. Defendant McGaw used Plaintiff's name, likeness, and professional identity in online physician profiles.

438. Such use was unauthorized and for Defendants' commercial benefit.

439. Defendant McGaw profited by diverting patients and referrals under Plaintiff's name.

440. Plaintiff suffered reputational damage and loss of business opportunities.

    L.   Regarding the Count of Violation of Ohio Right of Publicity Act, Ohio Rev. Code § 2741 (Defendant Wood Health)

441. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

442. Defendant Wood Health similarly used Plaintiff's name, likeness, and professional identity without authorization.

443. The purpose of the use was in part to promote Defendants' business interests.

444. Plaintiff did not consent to the use.

445. The conduct violated Ohio Rev. code § 2741, entitling Plaintiff ot damages.

    M.   Regarding the Count of Violation of Misappropriation of Name/Likeness (Iowa Common Law) (Defendant UnityPoint)

446. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated

herein.

447. Defendant UnityPoint appropriated Plaintiff's identity in part, for its own use.

448. This misappropriation caused Plaintiff reputational harm and diverted business away from the Plaintiff.

449. Plaintiff suffered damages including lost income and goodwill.

N. Regarding the Count of Violation of Misappropriation under Minnesota Law (Lake v. Wal-Mart, 582 N.W.2d 231 (Minn. 1998)) Common Law) (Defendant HealthPartners)

450. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

451. Defendant HealthPartners misappropriated Plaintiff's identity by creating or permitting false profiles to persist.

452. Such misappropriation was unauthorized and harmful to Plaintiff.

453. Plaintiff suffered reputational and economic damages as a result.

O. Regarding Count of False Light and Defamation Per Se (Iowa Law) (Against Defendants UnityPoint)

454. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

455. Defendant UnityPoint, through its agents, published false statements in a public administrative law record regarding Plaintiff's medical judgement.

456. These statements suggested Plaintiff was incompetent or negligent as a physician.

457. These statements were highly offensive to a reasonable person and placed Plaintiff in a false light.

458. These statements were made without Plaintiff's knowledge or opportunity to defend himself.

459. Separately, UnityPoint Health filed a frivolous complaint with the Iowa Medical Board.

460. That complaint, even though dismissed, remains a matter of record and harms Plaintiff's reputation.

461. These publications constitute defamation per se because they impute professional incompetence.

462. Plaintiff suffered reputational harm and economic damages.

P. Regarding Count of Violation of Minn. Stat § 179.60 (Blacklisting) (Against Defendant HealthPartners)

463. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

464. HealthPartners colluded with the other Defendants to prevent Plaintiff from securing future employment.

465. HealthPartners disseminated false and misleading information about Plaintiff's professional reputation.

466. The Minnesota Employer's conduct meets the statutory definition of blacklisting.

467. Plaintiff was denied employment opportunities in Minnesota and elsewhere as a result.

Q. Regarding the Count of Abuse of Process pursuant to Illinois Common Law (Defendant McGaw)

468. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.
469. Defendant McGaw misused judicial process in a family law tribunal proceeding.
470. Defendant McGaw sought to coerce Plaintiff into quashing a subpoena by using child support proceedings.
471. Defendant McGaw sought to coerce Plaintiff into quashing a subpoena to fraudulently conceal items in a settlement agreement.
472. Defendant McGaw evaded a subpoena response by misuse of consolidated divorce and foreclosure proceeding.
473. Such use of process was improper and for ulterior purposes.
474. Plaintiff suffered garnishment and reputational harm as a result.

R. Regarding the Count of Trespass to Chattel (Defendant Wood Health)

475. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.
476. At all relevant times, Plaintiff had lawful ownership of the physical mail described above, which constituted personal property.
477. Defendant Wood Health, without authorization or privilege, intentionally interfered with Plaintiff's possessory interest in that property by soliciting, accessing, and withholding the mail, thereby preventing Plaintiff from accessing it in a timely and rightful manner.
478. Defendant's conduct impaired the condition, value, and utility of the property by exposing its confidential contents and delaying Plaintiff's access to time-sensitive legal information.
479. Defendant's interference was neither trivial nor accidental, and caused measurable harm to Plaintiff, including emotion and legal consequences.
480. The mail withheld by Defendant including time-sensitive court filings, the withholding of which directly caused Plaintiff to miss a deadline and subsequently suffer a default judgment in his divorce proceeding.
481. Defendant Wood Health's unauthorized interference with Plaintiff's mail and legal documents constitutes a trespass to chattel, in that Defendant Wood Health:
    a. Intentionally exercised unauthorized control or dominion over Plaintiff's personal property
    b. Impaired the condition, quality, and value of the property by denying Plaintiff timely access to it;
    c. Caused actual harm to Plaintiff through the resulting default judgement and legal prejudice.
482. The Defendant acted willfully and with reckless disregard for Plaintiff's property rights and privacy.
483. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered:
    a. Legal harm due to the default judgement;
    b. Emotional distress and anxiety;
    c. Loss of property rights in his personal mail;

     d.  Other damages to be proven at trial.

  S.  <u>Regarding the Count of Intentional Infliction of Emotional Distress (Against All Defendants)</u>

484. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

485. Defendants engaged in extreme and outrageous conduct, including:
     a.  Fabricating false online profiles
     b.  Interfering with tribunal proceedings;
     c.  Tampering with Plaintiff's mail;
     d.  Filing frivolous complaints with medical boards;
     e.  Interfering with Plaintiff's attorneys; and
     f.  Blacklisting Plaintiff across multiple states.

  T.  <u>Regarding the Count of Violation of the Lanham Act, 15 U.S.C. § 1125(a) (False Designation of Origin/Unfair Competition (Against All Defendants)</u>

486. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

487. Defendants created and disseminated false online physician profiles using Plaintiff's name and likeness.

488. These profiles misrepresented Plaintiff's professional affiliation, falsely listing past employers' contact information.

489. Such conduct constitutes a false designation of origin, misleading consumers, patients, and referral sources as to the source and sponsorship of Plaintiff's services.

490. Defendants' actions diverted patients and professional opportunities away from Plaintiff.

491. These false profiles were used in commerce, appearing in Google search results accessible nationwide.

492. Plaintiff's professional reputation and ability to compete were damaged.

493. Defendants acted willfully and with malice in misappropriated Plaintiff's identity.

  U.  <u>Regarding the Count of Violation of 42 U.S.C. § 1981 (Race Discrimination and Retaliation) (Against All Defendants)</u>

494. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

495. Plaintiff is African-American and a member of a protected class.

496. Plaintiff engaged in protected activity by opposing racial discrimination and retaliation.

497. Defendants interfered with Plaintiff's contractual rights and ability to make and enforce employment contracts.

498. Defendant McGaw retaliated by breaching a settlement agreement and interfering with tribunal proceedings.

499. Defendant UnityPoint retaliated by instigation a frivolous medical board complaint and publishing false and defamatory allegations about the Plaintiff.

500. Defendant WoodHealth retaliated by pressuring Plaintiff to sign a waiver, tampering with

his mail, and terminating him after police involvement.

501. Defendant HealthPartners retaliated by engaging in blacklisting conduct and disseminating false information online.

502. Defendants' coordinated actions were motivated by racial animus and retaliatory intent.

503. Plaintiff suffered lost income, reputational harm, emotional distress, and career destruction.

### V. Tortious Interference with Prospective Employment and Business Relations (Against Defendants McGaw, WoodHealth, and HealthPartners)

504. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

505. Plaintiff had prospective employment and business opportunities with hospitals, clinics, and patients.

506. Defendants knew of these opportunities and intentionally interfered with them.

507. Defendants' interference included suppressing Plaintiff's professional website in search results and diverting business, publishing false statements online and affixing them to search criteria using the Plaintiff's name, communicating false information to and interfering with professional licensing board procedures, and communicating false information to the National Practitioner Data Bank.

508. Defendant McGaw included communications with opposing counsel and concealed settlement Exhibits.

509. Defendant WoodHealth's interference included coercion with waiver documents and false termination grounds.

510. These actions were unjustified and malicious.

511. As a result, Plaintiff lost income and future employment opportunities.

### W. Regarding the Count of Intrusion Upon Seclusion (Defendant Wood Health)

512. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

513. Plaintiff is a private individual with a reasonable expectation of privacy of his personal and confidential information, including his mailing address and the contents of his personal mail, particularly court documents related to a divorce proceeding

514. Without the Plaintiff's consent, Defendant Wood Health posted Plaintiff's mailing address – which was not the address Plaintiff provided or authorized for public or work-related use or for service of court documents for Case 2019D8356 – on the Defendant's public website.

515. The publication of Plaintiff's address was done for the purpose of soliciting mail on Plaintiff's behalf, without Plaintiff's permission, knowledge, or participation.

516. As a direct result of this unauthorized posting, Defendant Wood Health received mail addressed to Plaintiff at the publicized address, including confidential legal correspondence related to Plaintiff's divorce proceedings.

517. Defendant Wood Health intentionally opened, reviewed, and retained this mail without Plaintiff's knowledge or consent.

518. The Opened mail included sensitive and private court documents, including filings and/or orders related to Plaintiff's family law matter.

519. The Defendant's actions were highly offensive to a reasonable person and con stituted a

serious invasion of Plaintiff's privacy.

520. Defendant's conduct was intentional, willful, and malicious, and done without any legitimate justification or business necessity.

521. As a direct and proximate result of Defendant's intrusion upon seclusion, Plaintiff has suffered emotional distress, mental anguish, loss of dignity, violation of privacy, compromised legal rights and privileged communications.

522. Defendant Wood Health's actions constitute the common-law tort of Intrusion Upon Seclusion under Ohio Law, as recognized in Housh v Peth, 165 Ohio St. 35 (1956), and its progeny.

## X. Regarding the Count of Discrimination, Harassment & Wrongful Termination (ORC 4112) (Defendant Wood Health)

523. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

524. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

525. Plaintiff is a member of a protected class (Black/African-American).

526. Plaintiff was subjected to:
   a. A hostile work environment;
   b. Harassment;
   c. Racially motivated differential treatment;
   d. Wrongful termination.

527. Similarly situated non-Black employees were not treated in the same manner.

528. Defendant's actions constitute violations of Ohio Revised Code § 4112.02, which prohibits race-based discrimination and harassment in employment.

529. As a direct result, Plaintiff suffered economic damages, emotional distress, and loss of professional standing.

## Y. Regarding the Count of Retaliation (ORC 4112) (Defendant Wood Health)

530. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

531. Plaintiff engaged in protected activity by:
   a. Filing an EEOC complaint against a former employer Defendant McGaw
   b. Refusing to sign a waiver exonerating employer Defendant McGaw
   c. Filing a charge with the Ohio Civil Rights Commission (OCRC)

532. Defendant had knowledge of these protected activities.

533. Defendant retaliated by:
   a. Creating a hostile work environment;
   b. Soliciting, Opening and withholding Plaintiff's Private mail that had sensitive contents related to a divorce proceeding;
   c. Demoting the Plaintiff in practice;
   d. Terminating the Plaintiff without cause.

534. Such conduct violates Ohio Revised Code § 4112.02(l), which prohibits retaliation for

protected civil rights activity.

Z.  Regarding the Count of Wrongful Termination in Violation of Ohio Public Policy (Defendant Wood Health)

535. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

536. Defendant's conduct violated Ohio's clearly expressed public policy as set for in the Ohio Fair Employment Practices Law (ORC 4112.02), which prohibits discrimination on the basis of race.

537. Plaintiff's termination was motivated by discriminatory and retaliatory reasons, and not any legitimate business necessity.

538. This termination violates the public policy of the State of Ohio and gives rise to an actionable claim under Greeley v. Miami Valley Maintenance Contractors, Inc., 49 Ohio St. 3d228 (1990)

AA.      Regarding the Count of Abuse of Process (Defendant Wood Health)

539. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

540. At all relevant times, Plaintiff was a physician employed under contract with Defendant.

541. Plaintiff had previously engaged in protected activity by filing a charge of discrimination with the EEOC against a former employer.

542. During the course of his employment with Defendant Wood Health, Plaintiff was subjected to retaliatory conduct after refusing to sign a waiver exonerating the former employer from that EEOC complaint.

543. Plaintiff was simultaneously involved in a private divorce proceeding in an Illinois court.

544. Upon information and belief, Defendant Wood Health, through its agents and representatives, engaged in inappropriate and improper communications with:
   a.  The Judge presiding over Plaintiff's divorce proceeding;
   b.  Opposing counsel in that proceeding;
   c.  An attorney representing the former employer against whom the Plaintiff had filed the EEOC complaint.

545. Defendant had no legitimate business interest or legal standing in the divorce action and was not a party to the proceeding.

546. Defendant obtained and interfered with the legal process by:
   d.  Soliciting, opening, and withholding Plaintiff's court documents and communications related to the divorce;
   e.  Gaining access to confidential and privileged documents exchanged in the course of litigation;
   f.  Timely delivery of these documents to the Plaintiff were essential to his legal defense.

547. As a direct and proximate result of Defendant's interference and misuse of legal process, Plaintiff suffered a default ruling in the divorce case, causing:
   g.  Legal Harm,
   h.  Emotional distress,

      i. Public embarrassment,

      j. Irreparable reputational damage,

      k. A violation of his right to due process.

548. Defendant Wood Health's actions were not undertaken in furtherance of any lawful interest in the divorce proceeding but were instead designed to:

      l. Punish and retaliate against Plaintiff for prior protected activity,

      m. Coerce Plaintiff into abandoning his EEOC claim against a third party,

      n. Embarrass Plaintiff and gain undue leverage by misusing the legal system.

549. Defendant Wood Health's conduct constitutes an intentional Abuse of Process under Ohio law as defined in Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A., 68 Ohio St. 3d 294 (1994), in that Defendant:

      a. Used legal process (ie, court filings, court communications, discovery documents) in a manner not proper in that regular course of procedure;

      b. Engaged in such use with an ulterior motive of retaliation, coercion, and harassment;

      c. Caused concrete harm and injury to Plaintiff as a result.

550. Defendant Wood Health's conduct was intentional, malicious, and in reckless disregard of Plaintiff's rights.

### BB.     Regarding the Count of Breach of Contract (Defendant Wood Health)

551. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

552. A valid, enforceable contract existed between Plaintiff and Defendant.

553. Plaintiff entered into contract that contained specific terms, including a mediation clause, required pay upon breach of the contract, and additional terms governing workplace conditions and good faith performance.

554. Plaintiff fully performed his obligations under the contract.

555. Plaintiff engaged in protected activity by reporting and opposing discriminatory practices and retaliation in the workplace.

556. Shortly after Plaintiff engaged in this protected activity, Defendant retaliated against him.

557. Defendant disregarded the contract's mediation clause, and failed to initiate or participate in required mediation before moving to terminate Plaintiff's employment.

558. Defendant wrongfully terminated Plaintiff in violation of the express terms and spirit of the employment contract.

559. Defendant further failed to pay wages and benefits owed under the contract.

560. Defendant's actions also violated the contract's implied covenant of good faith and fair dealing.

561. Defendant breached the contract by:

      a. Terminating Plaintiff's employment without cause;

      b. Failing to pay wages, benefits, and compensation owed;

      c. Failing to honor the mediation clause;

      d. Failing to provide appropriate notice per terms and cure rights; and

      e. Otherwise failing to comply with the terms of the contract.

562. Plaintiff suffered substantial damages, including lost wages, lost benefits, reputation harm, and emotional distress as a result of Defendant's breach.

563. As a direct and proximate result of Defendant's breach, Plaintiff suffered damages in excess

of $75,000, including lost wages, benefits, and professional opportunities.

### CC.    Regarding the Count of Breach of Implied Covenant (Defendant Wood Health)

564. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.
565. Every contract under Ohio law includes an implied covenant of good faith and fair dealing.
566. Defendant violated this covenant by retaliating against Plaintiff for engaging in protected activity, by using termination as pretext, and by depriving Plaintiff of the benefits of the bargain.
567. Defendant's conduct was willful, wanton, and in reckless disregard of Plaintiff's rights.
568. Plaintiff suffered damages as a result of Defendant's bad faith, including financial losses, reputational harm, and emotional distress.

### DD.    Regarding the Count of Retaliatory Discharge in Violation of Contractual Rights (Defendant Wood Health)

569. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.
570. Plaintiff engaged in protected activity by opposing workplace discrimination.
571. Defendant's termination of Plaintiff was motivated by retaliation, not legitimate business reasons.
572. By terminating Plaintiff for engaging in protected activity, Defendant violated the contractual protections afforded to Plaintiff, including the mediation clause, appropriate notice, just cause provisions, and wage/benefit protections.
573. Plaintiff suffered lost income, lost professional standing, and other damages as a result.

### EE. Regarding the Count of Violation of Consumer Credit Protection Act (15 U.S.C. § 1673) (Defendant UnityPoint)

574. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.
575. Plaintiff was employed by Defendant UnityPoint pursuant to a valid employment agreement.
576. Plaintiff also received disability income that was recognized as protected income under federal and state wage protection laws.
577. Between Dec of 2022 and January of 2023, the Defendant initiated wage garnishment proceedings against Plaintiff's disability income.
578. Defendant garnished more than 50% of Plaintiff's disability income, in violation of 15. U.S.C. § 1673.
579. The CCPA prohibits garnishments of more than 25% of disposable earnings or, in cases involving family support obligations, more than 50% of disposable earnings.
580. Despite these statutory protections, Defendant deducted more than the lawful amount from Plaintiff's disability income.
581. Plaintiff notified the Defendant of his concern.
582. Defendant failed to stop the unlawful garnishment.

583. Defendant UnityPoint garnished more than the permissible percentage of Plaintiff's disability income, exceeding the limit imposed by the CCPA.

584. Defendant's conduct violated Plaintiff's rights under 15. U.S.C. § 1673.

585. As a direct and proximate result, Plaintiff suffered financial harm, including lost income and related damages.

FF. Regarding the Count of Violation of Iowa Code Chapter 91A (Wage Payment Collection Law) (Defendant UnityPoint)

586. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

587. Defendant unlawfully withheld wages and disability income in violation of Iowa Code §§ 91A.3, 91A.5, and 91A.6.

588. Defendant failed to comply with state law limitations on deductions.

589. Plaintiff suffered damages, including lost wages, financial instability, and related harm.

590. Under Iowa Code §91A.8, Plaintiff is entitled to recovery of unpaid wages, liquidated damages, attorney's fees, and costs.

P. Regarding the Count of Race Discrimination in Contracting (42 U.S.C. §1981) (Defendant UnityPoint)

591. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

592. Plaintiff performed his duties as a physician competently and in good faith.

593. Plaintiff reported concerns to physician supervisors about conduct that he believed was race-based discrimination in the workplace.

594. Defendant verbally offered Plaintiff a promotion to a higher role with additional responsibilities.

595. Without notifying Plaintiff, Defended rescinded the offer and instead awarded the position to a less qualified physician of a different race.

596. Later, Defendant extended a second promotion offer to Plaintiff, with incentive pay as part of the compensation package.

597. After Plaintiff accepted and performed under this promotion, Defendant diverted the incentive pay to itself rather than paying Plaintiff, in violation of the contract and the covenant of good faith and fair dealing.

598. Defendant's actions deprived Plaintiff of bargained-for compensation, professional advancement, and equal opportunity in the workplace.

599. Further, Defendant's supervisors circulated a mass email to staff falsely stating that Plaintiff had left his position and absconded with supplies.

600. Plaintiff had not resigned from his position, nor had he taken any supplies form the employer.

601. This false publication defamed Plaintiff, damaging his professional reputation and causing emotional distress.

602. Defendant denied Plaintiff equal rights under his employment contract on the basis of race, including:

   a. Rescinding a promotion and awarding it to a less qualified non-Black physician;

b. Diverting incentive pay; and

c. Retaliating against Plaintiff after reporting race-based discrimination.

603. Defendant's conduct was intentional and malicious.

604. Plaintiff suffered loss of employment opportunities, compensation, and professional reputation as a result.

### Q. Regarding the second Count of Defamation Per Se (Iowa Common Law) (Defendant UnityPoint)

605. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

606. Defendant, through its supervisors, published a false statement in a mass email claiming Plaintiff had left his position and absconded with supplies.

607. These statements were false and made with knowledge of falsity or reckless disregard for the truth.

608. The statements harmed Plaintiff's reputation in the professional community.

609. Plaintiff suffered damages, including reputational injury, emotional distress, and loss of standing.

### P. Regarding the Count of Breach of Contract (Iowa Common Law) (Defendant UnityPoint)

610. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully restated herein.

611. Plaintiff and Defendant entered into a valid and enforceable employment agreement.

612. Defendant breached the contract by:

a. Diverting incentive pay owed to Plaintiff

b. Failing to pay wages lawfully due; and

c. Otherwise acting in bad faith.

613. Plaintiff suffered economic damages as a direct result of Defendant's breach.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgement in their favor and against Defendants on all counts, and award the following relief as appropriate for the claims alleged herein:

A. That all Defendants be held jointly and severally for all damages and relief awarded;

B. Awarding compensatory damages in an amount exceeding $75,000 to be determined at trial for all actual losses suffered as a result of Defendants' conduct;

C. Consequential damages, including lost income, business opportunities, and harm to reputation;

D. General damages for emotional distress, mental anguish, and humiliation where applicable;

E. Punitive damages for Defendant's willful, malicious, or reckless conduct in

connection with tortious interference and defamation per se;

F.  Injunctive relief to prevent further defamatory or interfering conduct

G.  Pre-judgement and post-judgement interest as allowed by law;

H.  Monetary Relief including compensatory damages, punitive damages, and reasonable attorney's fees, pursuant to Ohio, Iowa, Illinois and Minnesota state law where applicable;

I.  Awarding interest, costs, and fees as permitted by law;

J.  Costs of suit and reasonable attorney's fees to the extent permitted by law or contract

K.  Statutory remedies available under the Illinois Whistleblower Act pursuant to 740 ILCS 174/25, including back pay, compensatory damages, attorney's fees, and costs.

L.  Statutory remedies available under the Illinois Human Rights Act, including back pay, compensatory damages for emotional distress and other non-economic harm, punitive damages for the Defendant's willful and malicious conduct, and attorneys' fees and costs incurred in bringing this action.

M.  Statutory remedies available under the Ohio Revised Code § 4112.04(G)(1) to grant broad equitable and monetary relief including back pay, affirmative action remedies, and attorney's fees pursuant to § 4112.05(K).

N.  Rescission of a Settlement Agreement entered into on or about 11/16/2018, on the grounds of:
    a.  Fraudulent inducement
    b.  Material Misrepresentation
    c.  Fraudulent concealment of material terms and exhibits
    d.  Continued retaliation in violation of the spirit and purpose of the agreement;
    e.  Breach of contract and failure of consideration under Illinois law;
    f.  And racially discriminatory interference with Plaintiff's contractual rights in violation of 42 U.S.S. § 1981;

O.  A declaration that a Settlement Agreement is null and void due to Defendant McGaw's fraudulent and deceptive conduct during its formation as well as due to subsequent retaliatory acts in violation of both federal and state law.

P.  An Order enjoining Defendant McGaw from further reliance on, or enforcement of, the rescinded Settlement Agreement;

Q.  An Award of compensatory damages in an amount to be determined at trial, for:
    a.  Retaliation and harm to Plaintiff's professional standing, emotional well-being, and economic status;
    b.  Damages stemming from Defendant's breach of contract, fraudulent conduct, and unlawful retaliation;

R.  Restoration of waived claims in the Settlement Agreement

S.  Federal remedies available under 42 USC §1981 including
    a.  Declaratory Relief: A declaration that Defendants' conduct violated Plaintiff's rights under 42 U.S.C. § 1981 by engaging in unlawful race discrimination and/or retaliation;
    b.  Injunctive Relief: An order directing Defendants, their actual and apparent agents, servants, employees, attorneys, and all persons in active concert or

participation with them from engaging in further acts of discriminatory and retaliatory conduct, cease and desist from further discriminatory and retaliatory practices and, where applicable, to provide front pay in lieu of reinstatement;

c. Compensatory Damages: An award or damages to compensate Plaintiff for lost wages, lost benefits, emotional distress, reputational harm, and all other losses resulting from Defendants' unlawful conduct;

d. Punitive Damages: An award of punitive damages in an amount sufficient to punish defendants for their willful and malicious conduct and to deter similar conduct in the future;

e. Attorney's Fees and Costs: An award of reasonable attorney's fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988;

f. Prejudgment and Post-Judgement Interests: an award of interest on all monetary awards as allowed by law

T. Relief pursuant to 15 U.S.C. §§ 116, 1117, and 1118 including:

a. A preliminary and permanent injunction restraining and enjoining Defendant, its agents, servants, employees, attorneys, and all persons in active concert or participation with them from engaging in further acts of false designation of origin, unfair competition, and any other acts likely to cause confusion, mistake, or deception, in violation of 15 U.S.C. § 1125(a);

b. An order requiring Defendants to recall, destroy, or forfeit all infringing products, advertisements, and promotional materials in Defendants' possession or control pursuant to 15 U.S.C. § 1118;

c. An award of Plaintiff's actual damages and Defendant's profits arising from Defendant's unlawful acts under 15 U.S.C. § 1117(a), or in the alternative, at Plaintiff's election, an award of damages according to proof;

d. An award of treble damages pursuant to 15 U.S.C. § 1117(a), due to the Defendants' willful and deliberate misconduct;

e. An award of costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1117(a), as this is an exceptional case; and

f. An award of prejudgment and post-judgement interest according to law.

U. Relief pursuant to 15 U.S.C. § 1673 including refund to Plaintiff all amounts unlawfully garnished in violation of 15 U.S.C. § 1673, an award of actual damages sustained by Plaintiff as a result of the unlawful garnishment, an award of statutory damages, costs, and reasonable attorney's fees as permitted under 15 U.S.C. §1677 and other applicable law;

V. Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

10/9/25

Marcus Rushing
2136 Ford Parkway #9304
St Paul, MN 55116
EqualRight2Dream@yahoo.com
Phone: 612-594-1439